Cameron McNEIL and Justin McNeil, Defendants Below, Appellants,

v.

Henry Slack McNEIL, Jr., Plaintiff Below, Appellee,

John C. Bennett, Jr., Charles E. Mather, III, PNC Bank, N.A. and Wilmington Trust Company, as Trustees U/A with Henry Slack McNeil dated January 2, 1959, Barbara McNeil Jordan, Marjorie McNeil Findlay and Robert Douglass McNeil, Defendants Below, Appellees.

No. 490, 2001, 497, 2001, 505, 2001.

Supreme Court of Delaware.

Submitted: April 9, 2002.
Decided: May 16, 2002.

Thomas R. Hunt, Jr., Esquire (argued), David J. Teklits, Esquire, and Thomas W. Briggs, Jr., Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Appellants and Cross Appellants John C. Bennett, Jr., Charles E. Mather, III, PNC Bank, N.A. and Wilmington Trust Company.

Lawrence C. Ashby, Esquire (argued) and Richard I.G. Jones, Jr., Esquire, Ashby & Geddes, Wilmington, Delaware, for Appellees Barbara McNeil Jordan, Marjorie McNeil Findlay, Robert Douglas McNeil, and their Adult Lineal Descendants.

Grover C. Brown, Esquire (argued), Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware, Guardian Ad Litem for Unborn Lineal Descendants of Henry S. McNeil, Sr.

Wayne N. Elliott, Esquire (argued), Elizabeth M. McGeever, Esquire, and D. Benjamin Snyder, Esquire, Prickett, Jones & Elliott, Dover, Delaware and John Treitz, Esquire, Ogden, Newell & Welch, Louisville, Kentucky, for Appellants Cameron McNeil & Justin McNeil.

James M. Mulligan, Jr., Esquire, Collins J. Seitz, Jr., Esquire and Samuel D. Brickley, II, Esquire, Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware and Lawrence T. Hoyle, Jr., Esquire (argued), R. David Walk, Jr., Esquire, and Elliot C. Fertik, Esquire, Hoyle, Morris & Kerr LLP, Philadelphia, Pennsylvania and Ralph A. Jacobs, Esquire, Ralph A. Jacobs

& Associates LLC, Philadelphia, Pennsylvania, for Appellant Henry Slack McNeil, Jr.

Before WALSH, HOLLAND, BERGER, STEELE, Justices and HARTNETT, Justice (Retired),* constituting the Court En Banc.

## CONSOLIDATED

WALSH, Justice.

This is an appeal from a decision of the Court of Chancery which determined that the trustees of a large *inter vivos* trust had breached their fiduciary duties by ignoring the interests of a beneficiary. By way of a remedy, the court ordered a make-up distribution to the petitioner, surcharged the trustees, and removed certain of the trustees. The court rejected the beneficiary's request to further divide the trust and prevent the adoption of a unitrust formula. Upon full review of the record, we conclude that the Vice Chancellor properly exercised his discretion under applicable trust law in granting relief to the beneficiary, except with respect to the replacement of a trustee. As to that latter ruling, we conclude that the trust instrument, in the first instance, controlled the process for replacement. Accordingly, we affirm in part and reverse in part.

## I

The decision of the Court of Chancery is contained in a seventy-four page opinion detailing the court's factual findings and legal conclusions following a six day trial.[1] Because the parties do not dispute the factual findings of the Vice Chancellor, we recite only those facts necessary for an understanding of the contentions of the parties.

The trust in dispute was one of five trusts established by Henry Slack McNeil, Sr. ("McNeil, Sr.") in 1959 from the proceeds of the sale of a pharmaceutical company owned by him to Johnson and Johnson. Four of the trusts, referred to as the "Sibling Trusts," were designated for the benefit of McNeil, Sr.'s four children: Henry, Jr. ("Hank"), Barbara, Marjorie, and Robert. The fifth trust, established by McNeil, Sr. for his wife, Lois, came to be known as the Lois Trust. Each of the separate children's trusts was intended to accommodate the needs of the respective beneficiary with authorization to the trustees to afford each the means to live an affluent lifestyle. The children were quite young at the time of the creation of the trusts, ranging in age from eight to fifteen. It was not until some years later that the trustees of the Sibling Trusts were called upon to provide the children an independent source of income.

Although the children were under the impression, an impression apparently fostered by their father, that their interests in the Lois Trust were that of remaindermen, the terms of the trust provided otherwise. The trust instrument gave its trustees considerable discretion to "distribute any part or all of the income and principal of the trust to or among my lineal descendants and their spouses, and Lois." Thus, all of McNeil, Sr.'s children, and their descendants, were not remaindermen but current beneficiaries. It was the lack of such knowledge and its unequal dissemination that is at the root of the litigation between Hank and the trustees, with Hank's siblings ("The Other Siblings") also joined as defendants.

The original trustees of the Lois Trust included three individuals, George Brod-

---

* Sitting by designation pursuant to Del. Const. art. IV, § 38 and 29 *Del. C.* § 5610.

1. *McNeil v. Bennett,* 792 A.2d 190 (Del.Ch. 2001).

head, Robert C. Fernley, and Henry W. Gadsden, as general trustees, and Wilmington Trust Company as the administrative trustee. Later, Gadsden and Fernley were replaced by Charles E. Mather, III, a close friend of McNeil, Sr., and Provident National Bank ("PNC"). There is little question that Brodhead, a close friend and attorney for McNeil, Sr., was the dominant trustee, to whom the other trustees, and all the siblings, deferred. There is also no doubt, however, that all trustees, including the administrative trustees, were aware that the McNeil siblings enjoyed the status of current beneficiaries of the Lois Trust.

At some point, Hank became estranged from his parents and his siblings. A direct result of this estrangement was that Hank received nothing under his father's will and, upon the later death of his mother, only two million dollars, a paltry sum in comparison to that received by his siblings. Hank was not without substantial wealth, however, since his own trust responded to many, but not all, of his requests for distribution. Eventually, Hank sued the trustees of his trust, who were essentially the same as the trustees of the Lois Trust, seeking a greater distribution. The trustees requested Hank's own children, Cameron and Justin, take a position on Hank's petition because, under a mirror image provision of the Lois Trust, Hank's children were also current beneficiaries. Thus, it could be argued that Hank's request for additional distributions was adverse to all of his living descendants. Prior to the trustees' notification, Cameron and Justin had been unaware of their status. The question of Hank's right to distribution under his trust, vis-a-vis the entitlement of his children to share a current

distribution, ultimately resulted in separate litigation in the Court of Chancery.[2]

Claiming to have been misled, if not deceived, by the trustees of the Lois Trust concerning his current beneficiary status, Hank filed a complaint in the Court of Chancery seeking, *inter alia,* a make-up distribution from the trust, removal of and a surcharge against the trustees, and a restructuring of the trust operation. In addition to the trustees, other interested parties joined, or were joined, in the litigation, including Hank's siblings, Cameron and Justin, and a guardian *ad litem* representing the unborn beneficiaries of the Lois Trust.

## II

The Vice Chancellor ultimately concluded that Hank's "outsider" status, which began during his father's lifetime, was continued by the trustees of the Lois Trust. By contrast, however, The Other Siblings not only benefitted directly from their parents' estates, but were made privy to many aspects of the operation of all five trusts and, through their participation in a family holding company, Claneil Industries, were never "outside the loop." The Vice Chancellor further concluded that not only did the trustees rebuff Hank's efforts to learn the specifics of the Lois Trust, they acquiesced in Lois' wish, expressed strongly during her lifetime, not to invade principal. That principal consisted primarily of Johnson and Johnson stock and had appreciated substantially in value over the life of the trust.[3] The Other Siblings were content with Lois' direction to permit principal to grow but the matter came to a head upon Lois' death in 1998, when the trustees proposed to make distribution of the

---

2. *Bishop v. McNeil,* 1999 WL 743489 (Del.Ch. 1999).

3. At the time of trial in the Court of Chancery, the Lois Trust had a value in excess of $300 million dollars.

Lois Trust in four equal divisions. The trustees also sought to adopt a "unitrust" approach for distribution under which the beneficiaries would receive a percentage of the total value of the trust, both principal and income, each year.

After trial, the Vice Chancellor determined that the trustees had breached their fiduciary duties by failing to inform Hank of his current beneficiary status in a timely fashion, showing partiality to The Other Siblings, and allowing the trust to operate "on autopilot." Since the trustees had considerable distribution discretion, the court recognized that it was somewhat "speculative" to fashion a remedy for the failure of the trustees to respond to requests never made, particularly given Lois' strongly expressed desire to maintain the trust corpus. Nevertheless, the court concluded that any uncertainty with respect to the appropriateness of the remedy should be resolved against the trustees, who failed to fulfill their obligation to consider the interests of different generations of the McNeil Family. A make-up distribution equal to 7.5 percent of the value of Hank's resulting trust was ordered to be shared by Hank with Cameron and Justin under the unitrust formula.

The Vice Chancellor also determined that the trustees' failure to discharge their fiduciary duties warranted some penalty. In particular, he faulted the institutional trustees, PNC and Wilmington Trust, who "failed to bring their professional expertise to bear in assisting lay trustees." PNC was removed as a trustee and all Lois Trustees were surcharged one-fifth of commissions received for the years 1987 to 1996. The Vice Chancellor declined to remove certain other individual trustees but appointed Edward L. Bishop, one of Hank's trustees, as a replacement trustee for PNC for the resulting trusts.

III

The individual and corporate trustees of the Lois Trust, John C. Bennett, Jr., Charles E. Mather, III, PNC Bank, N.A. and Wilmington Trust Company (the "Lois Trustees") have appealed from that portion of the Vice Chancellor's decision imposing a surcharge on their trustees' commission and removing PNC as a trustee. While accepting the Vice Chancellor's factual findings, they nonetheless argue that those findings do not permit the conclusion that any breach of fiduciary duty owed to Hank occurred. They point to the language of the trust instrument, which confers on the trustees extraordinarily broad authority to manage the trusts, as indicative of McNeil, Sr.'s intention to protect the trustees from personal liability and "judicial second-guessing." The conduct of the Lois Trustees, it is contended, must be reviewed over the span of forty years, during which time they deferred to the wishes of McNeil, Sr. and his wife, and, as a consequence, the trust prospered and all beneficiaries, including Hank, ultimately benefitted.

Initially, we note a disagreement between the parties concerning the standard of review in this case. The Lois Trustees urge a *de novo* standard, asserting that since the factual findings of the Vice Chancellor are not disputed, the conclusions to be drawn from them are matters of law, both at the Court of Chancery level and upon appeal. The various appellees, for the most part, contend that the Vice Chancellor's findings of fact enjoy the standard set forth in *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del.1972), subject to reversal only if "clearly wrong" and the interests of justice so require.

In our view, the issues posed in this appeal require a hybrid approach. To the extent that no party to the appeal disputes the factual findings of the Court

of Chancery, the record may be considered a settled one, analogous to that presented by a "paper" record underlying cross-motions for summary judgment. In that posture, the reviewing court draws "its own conclusions with respect to the facts if the findings below are clearly wrong and if justice requires, especially where the findings arise from deductions, processes of reasoning or logical inferences." *Fiduciary Trust Co. v. Fiduciary Trust Co.*, 445 A.2d 927, 930 (Del.1982). With respect to the Court of Chancery's application of remedies for breach of a trustee's duties, however, that court, in the exercise of its plenary equitable authority over the supervision of trusts, is accorded broad discretion. *Law v. Law,* 753 A.2d 443, 445 (Del. 2000) (*citing Hogg v. Walker,* 622 A.2d 648, 654 (Del.1993) (Court of Chancery has "broad latitude to exercise its equitable powers to craft a remedy")).

 The Lois Trustees rely upon the express terms of the trust instrument as defining their duties. Three provisions of the Lois Trust appear to bear on this issue. Article II(a) gives the trustees wide discretion to distribute income or principal to any, all, or none of the beneficiaries as they see fit. Statements of this type are generally viewed as a definition of the trustees' powers, not as exculpatory of the liability of a trustee. *See* George Gleason Bogert, The Law of Trusts and Trustees, § 542 (1993) ("The grant of absolute or uncontrolled discretion to the trustee in the administration of the trust, without an exculpatory clause, may not relieve the trustee of liability for imprudent exercises of his powers..."). Further, Article III(e)

of the Lois Trust specifies, "Decisions by the committee [of trustees] ... [are] not subject to review by any court." Courts, however, flatly refuse to enforce provisions relieving a trustee of all liability. *Id.* (noting that exculpatory clauses that "provide[ ] that the trustee is not to be accountable to anyone ... [are] not upheld"). A trust in which there is no legally binding obligation on a trustee is a trust in name only and more in the nature of an absolute estate or fee simple grant of property.

Finally, Article IV(c) states, "Any action taken by the trustees in good faith shall be proper, and I relieve the trustees of all personal liability except for gross negligence or willful wrongdoing." Generally, a trustee must act as the reasonable and prudent person in managing the trust.[4] Courts often permit the settlor of a trust to exculpate a trustee for failure to exercise due care, however, so long as such conduct does not rise to the level of gross negligence.[5]

 A reasonable construction of these provisions, read together, is that the Lois Trustees were exculpated for ordinary negligence, but not the duty to (i) inform beneficiaries or (ii) treat them impartially. The duties to furnish information and to act impartially are not subspecies of the duty of care, but separate duties. *See* Restatement (Second) of Trusts §§ 173, 174, and 183 (1959) (devoting separate sections to a trustee's duty of care, duty to furnish information, and duty to act impartially). Whatever may have been McNeil, Sr.'s intention in this regard, he did not expressly relieve the trustees of the duties

---

4. *See* 12 *Del. C.* § 3302(a) (providing that a fiduciary of a trust "shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account").

5. *See* Bogert, *supra,* § 542 (noting that courts enforce exculpatory clauses that "seem clearly intended to relieve the trustee from his duty to use ordinary skill and prudence").

which formed the basis for Hank's petition in the Court of Chancery.

There is ample record support for the Vice Chancellor's conclusion that the Lois Trustees violated their duty to provide information. It may be the case that McNeil, Sr. and Lois did not favor treating their offspring as current beneficiaries of the Lois Trust, and that it was defensible for some of the trustees who served later on to assume that notification had already been accomplished. Nevertheless, both PNC and Wilmington Trust, institutional trustees with policies of notification, should have known better. Moreover, Henry's repeated attempts to get information should have put the trustees on notice that he did not know he was a current beneficiary. A trustee has a duty to furnish information to a beneficiary upon reasonable request. Furthermore, even in the absence of a request for information, a trustee must communicate essential facts, such as the existence of the basic terms of the trust. That a person is a current beneficiary of a trust is indeed an essential fact.

The Lois Trustees, and Brodhead in particular, denied important information to Hank even after he made a reasonable request for information. PNC's representative rebuffed a similar request, and Wilmington Trust's representative even misled Henry by telling him he was a remainderman in the Lois Trust. The trustees each had a vested interest in the way they had been doing business, and giving Hank information would have forced them to re-examine that method. Although Brodhead obviously dominated the trustees and controlled their approach to Hank, each trustee was charged with an independent fiduciary obligation which did not permit them to defer to Brodhead's exclusionary views.

At the same time they were excluding Hank from knowledge of the terms of the trust and its operating results, the Lois Trustees shared that information with The Other Siblings, albeit in an indirect fashion through their participation in Claneil. This partiality precluded Hank from making distribution demands under circumstances not shared by his siblings. The trustees' claim that they distributed tens of millions of dollars to Hank from his own trust is no defense to their blatant failure to inform him of his current beneficiary status in the Lois Trust. As the Vice Chancellor noted, Hank "was at an obvious informational disadvantage to his Siblings with regard to the Lois Trust." The record amply supports the Vice Chancellor's conclusion that the Lois Trustees failed to discharge the fiduciary duties owed to all beneficiaries of the trust. Accordingly, we affirm that ruling.

## IV

### A.

The Lois Trustees next contend that even if they were deficient in the discharge of their duties, the remedy ordered by the Court of Chancery was not proportionate to any harm done. In particular, they argue that in the absence of proof that the trust *res* has suffered a loss, there is no basis for an assessment of damages. In order to assess damages where none have been proved, the argument runs, a court must adopt a punitive rationale, an approach clearly not appropriate here where there has been no finding of malice or bad faith.

The Court of Chancery imposed a one-fifth surcharge against the trustees on commissions earned from 1987 to 1996, an amount which the court viewed as not "substantial." In view of our affirmance of the Vice Chancellor's findings of derelic-

tion, we find no abuse of discretion in surcharging the trustees who had not "properly" rendered the service for which compensation was given. *See* Restatement (Second) of Trusts § 243, cmt. a (1959). The conduct in question was not isolated but resulted from a pattern of deception and neglect over a span of many years. Imposing a surcharge representing a mere fraction of the commission charged to the trust is not out of proportion and we affirm.

## B.

▉ The Lois Trustees, joined by The Other Siblings, also dispute the Court of Chancery's ordering a make-up distribution of 7.5 percent of the value of Hank's resulting trust, "as part of the equitable remedy for breaches of the Lois Trust." Although he did not file a cross appeal from this portion of the Court of Chancery decision, Hank questions the source of the make-up distribution, contending that the court should have assessed the entire Lois Trust, not merely his resulting trust.

The imposition of a make-up distribution as a partial remedy in this case is, to a certain degree, speculative because it assumes that (a) Hank would have requested distribution had he known his status as a current beneficiary and (b) the trustees would have granted his request, particularly in the absence of similar requests from his siblings. There is ample reason to believe that Hank would have satisfied the demand requirement since he was continually seeking additional distribution from his own trust. Whether the trustees would have honored Hank's request is open to question but any doubt in that regard must be resolved against the trustees whose conduct led to the litigation and ultimate resolution of Hank's entitlement. Given the concerted efforts of the trustees over a long period of time to "wall-off"

Hank from the operation of the trust they are ill-suited to complain about the discretionary remedy ordered here. In any event, the make-up distribution does not invade the resulting trusts of The Other Siblings and, in effect, simply provides for a partial distribution of funds to which Hank had, at least, an equitable claim in previous years. We find no abuse of discretion with respect to this aspect of the remedy. Finally, permitting Cameron and Justin to share in the make-up distribution is clearly consistent with the pattern approved in the companion litigation and was equally within the court's discretion.

## V

▉ We next address the contention of the guardian *ad litem* that the Vice Chancellor's approval of the plan to divide the Lois Trust into four resulting trusts should be reversed as contrary to the settlor's intent. The class for which the guardian *ad litem* appears consists of a projected 119 individuals, representing the anticipated descendants of McNeil, Sr. who will be living at the time the trust expires in 2060. The guardian *ad litem* complains that the Court of Chancery's approval of the plan of the trustees of the Lois Trust to divide that trust into four resulting trusts creates a "pour-over" effect for the benefit of the siblings and their living descendants to the possible detriment of future generations of lineal descendants for whom the Lois Trust would have been intact.

There is no dispute that the trustees have the power to divide the Lois Trust. Article II(a) of the trust confers on the trustees the authority to "distribute any part or all of the income and principal of the trust to or among [the settlor's] lineal descendants and their spouses, and Lois." Article II(b) allows the trustees to make such distribution either "outright to, or in trust for, any one or more of the class

among which they may distribute." The trustees decision to pour-over the Lois Trust into four resulting trusts did not occur because the Court of Chancery ordered it done to remedy a perceived inequity in the trust operation. The division was the decision of the trustees, who, in effect, sought the approval of the Court of Chancery in the course of the litigation. Given the express authority conferred in the trust instrument, the Court of Chancery, or this Court on review, can disturb the trustees decision to divide the Lois Trust only if a division of the trust was unreasonable under the circumstances, *i.e.*, lacking a basis in prudence and care. 12 *Del. C.* § 3303 (stating provisions of trust instrument control absent wilful misconduct); *Wilmington Trust Co. v. Coulter*, 200 A.2d 441 (Del.1964).

The Vice Chancellor approved the division of the Lois Trust as a "rational reaction" to the differing needs and desires of four different families. We agree and further add that the division will also reduce the likelihood of dispute and litigation over claims of uneven distribution. The guardian *ad litem's* claim that the interests of future unborn beneficiaries might be at risk is not persuasive. His protest, though well intentioned, is premature. The trustees are vested with broad discretionary powers of distribution and should they exercise this power improperly in the future, redress is available, as this litigation attests. Finally, given the large size of the resulting trusts, and the unitrust distribution plan discussed hereafter, it does not appear likely that there will be a dissipation of the corpus to the detriment of unborn lineal descendants.

## VI

■ Hank has cross-appealed from the Vice Chancellor's approval of the Lois Trustees' adoption of the Unitrust Policy, under which the trustees proposed to treat 5 percent of the trust principal as distributable on an annual basis. Hank argues that the unitrust approach is not a satisfactory substitute for the broad discretion enjoyed by the trustees to invade principal to meet the reasonable demands of the beneficiaries, himself included.

The unitrust approach is designed to preserve principal by establishing a fixed and ascertainable pay out while at the same time broadening the source of distribution in periods, as at present, when income, particularly dividends, are of minor significance in measuring the growth of an equities-based trust. The Vice Chancellor approved the unitrust policy as within the discretion of the trustees in order to place the beneficiaries on notice of what distributions were available (approximately $4 million dollars annually per branch) and to encourage them to plan for such an allowance. Moreover, as the Court noted, the unitrust approach is merely a policy for distribution. The trustees continue to have the authority to invade principal to accommodate any unusual needs. We agree and add that along with the adoption of the pour-over separate trusts, the unitrust policy may also serve to redress the uncertainty and potential for friction between beneficiaries which engenders litigation. We find no basis to disturb the Vice Chancellor's approval of the unitrust.

## VII

### A.

■ Perhaps the most contentious issue in this appeal, and one which has placed the disputants in odd alignment, is the disagreement over the Vice Chancellor's removal and/or replacement of trustees charged with administering the separate resulting trusts. We review that ruling under an abuse of discretion stan-

dard but only to the extent the Court of Chancery had full authority to select new trustees. The Lois Trustees, joined by Cameron and Justin, argue that the court should not have removed PNC. Hank supports the removal of PNC and defends the appointment of Bishop but complains that the court should also have removed Mather who participated equally in the trustees' misconduct. Cameron and Justin separately argue that the court lacked the authority to appoint Bishop to replace PNC.

██ The Court of Chancery has the power to remove a trustee as "ancillary to its duty to see that the trust is administered properly." *In Re Catell's Estate*, 38 A.2d 466, 469 (Del.Ch.1944). While that authority should "be exercised sparingly," the court enjoys the discretion to remove a trustee who fails to perform his duties through more than mere negligence. *Id.* at 470.

The Vice Chancellor removed PNC because it had failed in its fiduciary duties to Hank, both in its handling of his trust and as a trustee of the Lois Trust. The court felt so strongly about PNC's conduct that it suggested it also resign from Hank's trust. PNC violated its own administrative policies in failing to inform Hank that he was a current beneficiary of the Lois Trust and, in view of its role in disputing Hank's request for distribution from his own trust, it surely knew that Hank was keenly interested in securing additional distributions from any trust source. Moreover, PNC pointedly rebuffed the efforts of Hank's lawyer to gain information about the Lois Trust. Apart from the question of whether the trust, itself, was damaged by its action, PNC's studied course of conduct cannot be condoned and we find no abuse of discretion in its removal.

██ While removal of PNC as a trustee was clearly within the court's discretionary power, a different question arises with respect to its replacement of PNC as trustee with Edward Bishop. Cameron and Justin argue that the court's appointment of Bishop as a trustee of the Lois Trust exceeded the court's authority to the extent it contravened the intent of the settlor under the terms of the trust. This claim poses a legal question subject to *de novo* review.

Under Article III(c) of the Lois Trust, each trustee was given authority to name his own successor, and, in the event a trustee failed, or was unable to so designate, the remaining general trustees could fill the vacancies or increase or decrease the number of general trustees. PNC became a general trustee in 1978 when it was selected to replace Robert Fernley, who resigned. Unlike Wilmington Trust who functioned as an administrative trustee, PNC exercised full authority as a general trustee. Despite the explicit provisions of the trust instrument setting forth the mechanism for replacement of a trustee who resigns, or, as in this case, leaves involuntarily, the Court of Chancery did not seek the input of the trustees left in place, Mather and O'Malley, nor did it explain why it gave no consideration to the terms of the trust.

██ The Court of Chancery possesses undoubted authority to appoint a trustee if the trust instrument fails to do so. *Craven v. Wilmington Teachers Ass'n.*, 47 A.2d 580, 584 (Del.Ch.1946). Where the terms of the trust provide a method for filling vacancies by some method other than by appointment of the court, however, the designated method of replacement should be followed. *Scott on Trusts* (Fourth ed.) § 388. Even when a court seeks to exercise its residual authority of appointment, it should do so "only

in rare circumstances," since the identity and number of the trustees is central to the structure of the trust and a key indicator of the intent of the settlor. *Schildberg v. Schildberg,* 461 N.W.2d 186, 191(Iowa 1990). *See also Matter of Guardianship of Brown,* 436 N.E.2d 877, 889 (Ind.App.1982) (holding court should defer to procedure prescribed in trust instrument "absent a showing that to do so would frustrate the purpose of the trust or be detrimental to the interests of the beneficiaries").

In selecting Bishop as a successor to PNC in the Lois Trust, the Vice Chancellor was apparently motivated by Bishop's compatibility with Hank in the operation of Hank's trust and the prospect that joint trusteeship would have some advantages. While these are worthwhile considerations, and perhaps entitled to deference were the Court of Chancery writing on a clean slate, they do not excuse disregard of the settlor's plan for replacement of trustees. In permitting Mather and O'Malley to remain as trustees, the Vice Chancellor recognized their suitability to discharge their duties as trustees. The selection of a replacement trustee is a stipulated duty under the terms of the trust. The designation of replacement trustees is a matter for the settlor's determination in the first instance and, where that intention is expressed, should not be disregarded in the absence of compelling circumstances such as the unsuitability of a designated replacement. Accordingly, we reverse that portion of the Vice Chancellor's decision designating Bishop as a replacement for PNC in the resulting trusts and remand for further consideration on this issue, taking into account the settlor's intention.

### B.

With respect to the Vice Chancellor's refusal to remove Mather, of which

Hank complains, we defer to the Vice Chancellor's discretion. It is true that Mather was a trustee at the time Hank was misled by PNC and Wilmington Trust, but apparently Mather did not join in that deception. Moreover, as the Vice Chancellor noted, Mather was a layperson who relied upon the institutional trustees and Brodhead, who was a lawyer. Having observed Mather in two trials, the Vice Chancellor concluded that Mather acted in good faith with "sincere concern for all Family members." Given the Vice Chancellor's advantage of personal observation we are not inclined to disturb his judgment.

### VIII

Finally, we find no abuse of discretion in the refusal of the Court of Chancery to require the Lois Trustees to pay Hank's legal fees and in permitting the trustees to be reimbursed for their fees from the Lois Trust.

The American rule, which is of general application, requires each side to bear the cost of its attorney's fees. *Brice v. State Dept. of Correction,* 704 A.2d 1176, 1178 (Del.1998). The Court of Chancery may exercise its discretion to award attorneys' fees as an exception to this rule where a fund is created or, as here, the distribution of a trust is in dispute. Appropriate factors may include: (i) whether the trustees' breach of duty was fraudulent or in bad faith; (ii) the nature and extent of the wrongful conduct; and (iii) whether the action resulted in a benefit to the trust. *See Wilmington Trust v. Coulter,* 208 A.2d 677, 682 (Del.Ch.1965); *Bogert, supra,* § 871 at 191, 193. Here, Henry's suit did not benefit the trust, only him. Although the extent of the breach was serious (and extended), the Court of Chancery specifically concluded that the trustees' actions

were ill considered and wrong, but not in bad faith. Finally, the Court of Chancery observed that Hank was not successful in a significant portion of the claims he asserted in the litigation.

■ Although the Court of Chancery imposed a surcharge on the trustees, that fact alone does not preclude the recovery of counsel fees incurred in defending the litigation since success is not the test. *Restatement (Second) of Torts*, § 188 cmt. b (1959); *Wilmington Trust Company v. Coulter*, 208 A.2d 677 (Del.Ch.1965). Here, the Vice Chancellor, in the exercise of his discretion, concluded that the conduct of the Lois Trustees, particularly the individuals, did not warrant departure from the usual rule that trustees who defend litigation against the trust are entitled to look to the trust for reimbursement of that expense. We find no basis for disturbing that discretionary ruling.

## IX

In sum, we affirm all rulings of the Court of Chancery which are the subject of the appeals and cross-appeals in this matter save one: the replacement of PNC with Bishop. As to that ruling, we reverse and remand to the Court of Chancery for further proceedings consistent with this opinion.