# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| Marie Ann Hurd, | ) | C.A. No.  4675-MG |
| Plaintiff, | ) |  |
| v. | ) |  |
|  | ) |  |
| Leonard Hurd, Jr., Individually and as Trustee | ) |  |
| Of the Marie Ann Hurd Trust, | ) |  |
| Defendant. | ) |  |

## MASTER'S REPORT

Date Submitted:  March 6, 2018
Draft Report:
Final Report:  March 26, 2018

John V. Work, Esquire, of the Law Office of John V. Work, Wilmington, Delaware: Attorney for Plaintiff

J. Jackson Shrum, Esquire, of Austria Shrum, LLC, Wilmington, Delaware: Attorney for Defendant

GRIFFIN, Patricia

## BACKGROUND

At issue is a trust that was established to provide resources to the settlor's wife, Marie Ann Hurd (hereinafter "Mrs. Hurd"), after the death of Leonard Hurd, Sr. (hereinafter "Mr. Hurd") in 2000, during her lifetime. The trust agreement provided that the Marie Ann Hurd Trust (hereinafter "the Trust") was to be funded with four items of settlor's property (his travel trailer, pick-up truck, condominium at 7 Rockford Road, D-15, Wilmington, Delaware, and Delmarva Power common stock), as well as "an amount equal to the excess, of any, of Five Hundred Thousand Dollars ($500,000.00) over the value determined as of the date of settlor's death of the other property passing under this paragraph."[1] All net income from the Trust was to be paid to Mrs. Hurd in regular installments ("at least quarterly and preferably monthly"), and distributions from the Trust principal made for the health, education, support or maintenance of Mrs. Hurd.[2]

The trust agreement also established irrevocable lifetime trusts for the benefit of Leonard Hurd, Jr. (hereinafter "Leonard" or "the trustee"), Mr. Hurd's son from a previous marriage. The lifetime trusts terminate at Leonard's death, with the trust proceeds being distributed according to Leonard's will or to Leonard's surviving heirs, if Leonard doesn't provide for distribution of the proceeds. Upon Mrs. Hurd's

---

[1] Tr. Ex. 4 (Leonard Hurd Revocable Trust Agreement), ¶ 3.3 (Mar. 21, 1997).
[2] *Id.*, ¶ 4.1(A).

death, the trust agreement provides that any principal remaining in the Trust will be distributed to Leonard's lifetime trusts, or according to Leonard's will or to his heirs, if Leonard does not survive Mrs. Hurd. Leonard was appointed the trustee of his stepmother's Trust.

In 2009, Mrs. Hurd filed a complaint against Leonard, the trustee, alleging several breaches of fiduciary duty and seeking damages, an accounting of the trust and his removal as trustee. After trial and post-trial briefing, Master Ayvazian issued a final Master's Report on September 20, 2016 (hereinafter "Master's Report), finding that Leonard breached his fiduciary duty to the Trust's beneficiary, Mrs. Hurd, and recommending that the Court: (1) direct Leonard to provide a complete accounting of all Trust activities from the date of Mr. Hurd's death (April 18, 2000) to the present time, (2) direct Leonard to provide access to all documents regarding Trust income and assets, (3) enjoin and restrain Leonard from converting or using Trust income or assets, or taking further actions without court approval, (4) order Leonard to repay any amounts of Trust income or property wrongfully used or directed by him for his own benefit and/or the benefit of others affiliated with him, together with interest on all such amounts, (5) order Leonard to pay all costs associated with this litigation, including reasonable attorneys' fees, (6) suspend

Leonard as trustee, (7) appoint a receiver to administer the Trust, and (8) order the immediate disbursement of all Trust income in escrow to the beneficiary.[3]

Leonard filed exceptions to the Master's Report, which were briefed and argued before Vice Chancellor Glasscock on January 23, 2017.[4] Vice Chancellor Glasscock ordered that the parties confer on a third party receiver. Cover & Rossiter (hereinafter "the Receiver") was appointed receiver for the Trust by stipulated order on February 10, 2017 and ordered to conduct an audit and accounting of the Trust and present the Court and parties with a report on its findings.[5]

Vice Chancellor Glasscock conducted an evidentiary hearing on February 15, 2017 on Leonard's credibility and intent, and issued a bench ruling denying the exceptions and affirming the Master's Report. Further, Vice Chancellor Glasscock ordered Leonard removed as trustee.[6]

On April 26, 2017, Master Ayvazian held a contempt hearing concerning Leonard's failure to produce the documents requested by the Receiver and levied a

---

[3] *Hurd v. Hurd*, 2016 WL 5340210, at *6 (Del. Ch. Sept. 20, 2016).

[4] The Court also held a status hearing on January 31, 2017 to address Leonard's delay in releasing Trust income funds held in escrow.

[5] The February 10, 2017 Order specified that the report would include, but not be limited to, "(i) the initial valuation of the [Trust]; (ii) the property belonging to the [Trust]; (iii) the disposition of [Trust] property during the lifetime of the trust; (iv) debts or other amounts paid by the [Trust], including payments made to the Trustee, during the lifetime of the [Trust]; (v) the debts and expenses, if any, still owed by the [Trust]; (vi) the current disposition of property owned by the [Trust]; (vii) the income owed to the income beneficiary, and the amount actually paid, during the lifetime of the [Trust]; and (viii) any additional information that may be reasonably necessary to provide a full and definite understanding of the history and current condition of the [Trust]." *Hurd v. Hurd*, C.A. No. 4675-MA, § 6(c) (Del. Ch. Feb. 10, 2017) (ORDER).

[6] *Hurd v. Hurd*, C.A. No. 4675-MA, at 51 (Del. Ch. Feb. 15, 2017) (TRANSCRIPT).

coercive fine on Leonard to encourage the production of Trust documents requested by the Receiver.[7] Following subsequent letters from the parties' counsel concerning Leonard's failure to produce all documents requested, Master Ayvazian advised the parties on May 22, 2017 that the record shows that there are still missing documents that Leonard has not produced, and that "[a]s of today's date, the coercive fine is up to $1,200.00 and increasing daily."[8] On May 26, 2017, Leonard filed a motion for reconsideration of the Court's April 26, 2017 order levying coercive fines, arguing for the elimination of any coercive fines due to the impossibility of his compliance. That motion was briefed after the Receiver completed its report in October 2017.

The Receiver filed its report on October 27, 2017, containing its accounting of the Trust from April 19, 2000 through September 30, 2017, and its findings. Leonard submitted his objections to the Receiver's report on February 16, 2018, and Mrs. Hurd provided her response on February 19, 2018.

After review of the Receiver's report and consideration of the parties' responses, I recommend that the Court reject Leonard's objections, approve the Receiver's report, and order that Leonard pay the Trust $611,971.44 in income, plus any additional income deficiencies that have accrued since September 30, 2017 (when the reporting period for the Receiver's report ended), and $450,559.64 in cash

---

[7] Master Ayvazian ordered that Leonard be fined $100 every business day if missing documents are not provided to the Receiver by May 5, 2017, and increased the penalty to $200 per business day if not produced by May 19th, and to $300 per business day if not provided by June 2nd.
[8] Docket Item (hereinafter "D.I.") 107 (May 22, 2017).

in principal, as well as 6,075 shares of Nucor stock, or cash representing its value on the date that the Trust is repaid for this stock. I further recommend that the Court order the full amount of the income due be paid within 45 days after this report becomes final and that that all net income owed to the Trust by Leonard be distributed forthwith to Mrs. Hurd upon its payment into the Trust, consistent with the terms of the trust agreement.[9] Leonard's payment of the principal due should occur within six months following his repayment of the income obligation.

I also recommend that the Court grant Leonard's motion for reconsideration of the Court's April 26, 2017 order levying coercive fines on Leonard for his failure to provide requested documents to the Receiver, and find that, given all of the circumstances surrounding Leonard's production of documents for the Receiver during April and May of 2017, the coercive fine levied as of May 22, 2017 is vacated. This is a final report.

## ANALYSIS

### 1. RECEIVER'S REPORT ON PROPERTY WRONGFULLY WITHHELD FROM THE TRUST

---

[9] The trust agreement provided that Trust net income should be paid out to Mrs. Hurd and did not limit income distribution based upon proposed usage. Therefore, all outstanding income obligations are due for payment to Mrs. Hurd immediately. In contrast, the trust agreement limited the payout of principal from the Trust to pay for Mrs. Hurd's health, education, support, or maintenance, where income was insufficient. Tr. Ex. 4, ¶ 4.1(A). Following full repayment of the income obligations, principal obligations will then be repaid to the Trust, and paid out for Mrs. Hurd's health, education, support, and maintenance, if income is not sufficient to cover those needs.

In the September 20, 2016 Master's Report, Master Ayvazian found that the trust agreement was clear and unambiguous and required that, "if the total value (as of the date of settlor's death) of the first four gifts of property equals less than $500,000, then additional property is to be gifted to the Trust to make up the difference in value."[10] The initial funding of the Trust may be with "no less than $500,000 worth of property."[11] Therefore, the first four gifts composing the Trust would be valued as of the date of Mr. Hurd's death, while the funds or property needed to bring the value of the Trust up to $500,000 would be valued at the time of the initial funding of the Trust.

Further, she concluded that Leonard, as trustee of the Trust, violated his fiduciary duty to his stepmother and engaged in self-dealing through his actions, including: his failure to transfer the Delmarva Power common stock, which had become Conectiv stock by the time of Mr. Hurd's death, into the Trust when it was initially funded (despite including that stock as an asset on the Trust's initial accounting); his failure to attribute dividend income from that, or other stocks, to the Trust; his removal of assets from the Trust (to bring the value of the Trust down to "the maximum value of $500,000 per Trust document"), and shifting of those assets to himself; his charging

---

[10] *Hurd*, 2016 WL 5340210, at *4.
[11] *Id.*

of unreasonable rates for his services as trustee; and his refusal to reimburse Mrs. Hurd for the cost of a new refrigerator.[12]

Vice Chancellor Glasscock approved the Master's Report and found that Leonard acted in bad faith and not in the best interest of the beneficiary, and specifically noted Leonard's withholding of Trust payments from Mrs. Hurd for six years during the litigation, and that Leonard's actions – in taking assets from the Trust and placing them into an account owned by him – were "the epitome of bad faith."[13]

The Receiver completed its report, including its accounting and findings, on October 27, 2017. I highlight salient aspects of the Receiver's report below.

Underfunding of the Trust at its inception: The Trust was initially funded by the trustee based upon the values of a mobile home, travel trailer, pick-up truck, and condominium, minus combined losses from the sales of the mobile home, trailer and pick-up truck, plus cash. In addition, the Trust's initial accounting included shares of Conectiv (formerly Delmarva Power stock), Telefonos de Mexico (hereinafter "Telefonos"), Lonestar Steakhouse, Bergen Brunswig Corporation, Computer

---

[12] *Id.*, at *5-*6. The Master's Report concluded that the Trust agreement does not authorize the trustee to cap the value of the Trust at $500,000 or to remove assets from the Trust during Mrs. Hurd's lifetime.

[13] *Hurd*, C.A. No. 4675-MA, at 50-51 (TRANSCRIPT). Vice Chancellor Glasscock acknowledged the "built-in conflict" created by Mr. Hurd's construction of the trusts and placement of Leonard as trustee of Mrs. Hurd's Trust, when he was a remainder beneficiary of the Trust. *Id.* at 48.

Associates, and Nucor stock.[14] The Receiver's report found that the Trust was underfunded at its inception, mainly because the trustee used the date of death value (as of Mr. Hurd's death – April 2000) for all of the stock contributed to the Trust, rather than the value of those investments (except for Conectiv stock) when the Trust was actually funded – in July 2001.[15] The items of property specified in the trust agreement to be included in the Trust – his trailer, pick-up truck, condominium and Delmarva Power (Conectiv) stock – were valued at the time of Mr. Hurd's death, consistent with the trust agreement.[16] However, the trust agreement provided that the Trust must be worth $500,000 at the time it was initially funded, so the assets needed to bring the value of the Trust up to $500,000 must be determined as of the time they are placed in the Trust when it was initially funded. Further, the Receiver determined that the Conectiv stock (or its successor stocks) were never transferred into the Trust, so that changes in its value over the years, as well as the full dividends from that

---

[14] *See* D.I. 118, Ex. A (Feb. 19, 2018).

[15] The Receiver found there was substantial reduction in the value of the Telefonos stock, one of the stocks used to make up the Trust initially, between Mr. Hurd's death (April 2000) and the time the Trust was funded (July 2001). The value of that stock dropped by $72,210.94 during that time period and the trustee sought to impose this loss, which occurred before the Trust was funded, on the Trust. D.I. 116, Ex. Part 1 (Preparer's Notes for Receiver's First Intermediate Accounting, dated Oct. 27, 2017) (hereinafter "Preparer's Notes"), at 3.

[16] The Receiver eliminated the mobile home, which was included in the Trust's initial accounting, from consideration, since title to the property was never transferred to the Trust, nor were any proceeds from its sale deposited into the Trust. The Receiver also removed losses included in the Trust's initial accounting because they were not allocated for each asset (between the trailer, pick-up truck and mobile home) and the Receiver concluded that it is likely that the bulk of the losses were associated with the mobile home – the largest, and most difficult to sell, asset. Preparer's Notes, at 2.

stock, were not included as Trust principal or income.[17] Completing its review of the initial funding of the Trust, the Receiver found that the cash actually contributed to the Trust was approximately $12,000 less than as shown by the trustee on the Trust's initial accounting, resulting in the underfunding of the Trust, at its inception, by $57,973.48.[18]

Trustee's removal of stocks from the Trust: The Receiver found two instances where the trustee had removed stocks from the Trust principal, representing a combined amount due the Trust of approximately $460,459.[19] First, 6,075 shares of Nucor stocks were transferred from the trust on March 7, 2007. For the Nucor stock, the Receiver determined that the Trust principal is due for this stock (which had a market value of $340,443 as of September 30, 2017), as well as income to replace the lost dividends since the date of the stock's removal. Second, 6,500 shares of Telemex Internacional stock (hereinafter "Telemex") were transferred out of the Trust on June 16, 2008.[20] The Trust is due the value of the Telemex stock, as determined at the time of its merger with American Movil on June 20, 2010

---

[17] The Receiver noted, in detail, the partial dividends from this stock that were credited to the Trust on reconciliations (which stopped in 2003) and early tax returns. Preparer's Notes, at 3-4.

[18] The Receiver found that the cash actually contributed was $7,435.03, not the $19,337.08 indicated in the Trust's initial accounting. D.I. 116 (Receiver's Report dated Oct. 27, 2017) (hereinafter "Receiver's Report), at 2-3.

[19] The exact amount of this obligation due to the Trust depends upon the value of the Nucor stock at the time that the repayment occurs. *Id.*, at 4.

[20] The Trust owned Telefonos stock since its inception, which was replaced with Telemex stock, when Telefonos spun off a subsidiary, Telemex. Preparer's Notes, at 4.

($120,016), along with interest on that value since the merger, and lost dividends between the date of the stock's removal from the Trust and its merger.

Trustee's removal of cash from the Trust: The Receiver found instances in which cash had been removed from the Trust by the trustee and those funds were not transferred to any known Trust account. The largest amount removed at one time was $65,640, which was transferred out of the Trust on December 15, 2006 (and represented the same amount received by the Trust, on the same day, for the sale of its Lonestar Steakhouse stock).[21] The Receiver calculated the combined amount of these transfers at $113,256.53.

Total income and principal due the Trust: The Receiver calculated the combined income and principal due the Trust at approximately $1,402,974.08 (which will fluctuate depending upon the market value of Nucor shares at the time the shares, or its cash equivalent, is returned to the Trust). The Receiver noted that "this amount is a conservative calculation as it does not contemplate market appreciation on principal assets once they left the Trust, with the exception of Nucor."[22]

Income: The Receiver assessed the amount of income due the Trust from the trustee as $611,971.44. The interest was calculated by using the legal rate

---

[21] The Receiver reviewed all checks and electronic transfers from the Trust account, which were either payable or endorsed by the trustee or transferred to unknown accounts and noted several payouts, in addition to the $65,640 transfer, such as a $39,787.06 check on March 6, 2012; $328.04 paid out on April 17, 2012; and a $5,000 check, drafted to the Trust and endorsed by the trustee, on January 17, 2017. Receiver's Report, at 5.

[22] *Id.,* at 6.

of interest of 5% over the federal discount rate and compounding the interest annually. The Receiver determined that the interest should be compounded because of the length of years where the Trust was deprived of the interest. Lost dividends were calculated based upon public dividend payout records.

Principal: Based upon the Receiver's analysis, the Trust principal is due 6,075 shares of Nucor stock (or its cash equivalent at the time the value of the stock is returned to the Trust) and $450,559.64 in cash, for a combined approximate amount of $791,002.64 to be paid the Trust.

Comparison of payments to trustee vs. to beneficiary: The Receiver calculated the total payments to the trustee over the lifetime of the trust, including amounts paid by the trust to the trustee and assets and income which the trust was deprived of by the trustee, as $918,616.92.[23] The payments from the Trust to the beneficiary during April 19, 2000 and September 30, 2017 totaled $61,576.62, with $17,129.04 being paid to her in 2017 (and no distributions at all between 2010 and 2016).[24]

Leonard's objections to the Receiver's report: Leonard submitted several objections concerning the Receiver's findings, which are discussed below.

Leonard's first objection relates to the interest rate used by the Receiver and argues that the interest on amounts due and owing should not have been calculated at

---

[23] The Receiver found that the trustee allocated all of his compensation through the lifetime of the Trust to income, rather than splitting it between income and principal, as provided by controlling State of Texas law. Preparer's Notes, 5-6.
[24] *Id.*, at 6-7.

the legal rate of interest, which is 5% over the federal discount rate, compounded annually, but should have been based upon the interest rate for the account where the Trust's cash balance was retained, or at a rate of 0.5%. He asserts that the interest used by the Receiver represents an "unachievable benchmark for calculation of the actual value" of any of these items.[25] Mrs. Hurd responds that Leonard, as trustee, chose to invest substantially all of the Trust assets in equity securities, and invested "very little" of the Trust's assets in cash, making it reasonable to assume that the assets removed from the Trust would have been invested in securities but for the breach.[26] Accordingly, an equity-based rate of return is appropriate, rather than a card account interest rate. Given the circumstances in this case, I recommend the Court approve the Receiver's use of the legal interest rate compounded annually for calculating interest on amounts owed to the Trust, since it more closely mirrors what the Trust would have received but for the trustee's breach.[27]

In his other objections, Leonard argues that (1) he had discretion in making allocations between principal and income; disbursements and capital gains are

---

[25] D.I. 118, at 3.

[26] D.I. 119, at 4 (Feb. 19, 2018).

[27] Courts have held that, in cases involving trustee negligence or misconduct, the interest rate applied should be "sufficient to give [the beneficiaries] the net amount that they would otherwise have received as income and to restore to the trust estate any amounts expended from corpus." *Pennsylvania Co. v. Wilmington Trust Co.*, 189 A.2d 679, 682 (Del. Ch. 1963). Courts have the discretion to award simple or compound interest depending on the circumstances of the case, but often award compound interest, to address the "fundamental economic reality," in cases where the wrongdoing by a trustee occurred over long periods of time. *Mennen v. Wilmington Tr. Co.,* 2015 WL 1914599, at *36 (Del. Ch. Apr. 24, 2015), *aff'd sub nom. Mennen v. Fiduciary Tr. Int'l of*

generally allocated to principal, and the Receiver's report overstates losses to the Trust; (2) although he agrees that the Nucor shares should be returned to the Trust, the 0.5% rate should be used to calculate interest on the Nucor dividends to be paid to the Trust, after subtracting taxes paid on those dividends; (3) he used the value of the Conectiv stock, or $74,169, to cover multiple years of his "fees and expenses for going to Texas and handling asset sales and closing accounts incurred by the [Trust]," and all principal and income payments related to the trustee's failure to transfer the Conectiv stock to the Trust (or $299,757.29 as calculated by the Receiver) do not need to be returned to the Trust;[28] and (4) the proceeds from the sale of the pick-up truck and trailer were used to purchase the stocks that initially funded the Trust.

Mrs. Hurd responds generally to Leonard's criticism of the Receiver's report by stating that the Receiver has expertise in trust and forensic accounting, was appointed without objection by Leonard, and Leonard offers no opinions from a licensed accountant or appropriately qualified expert to support his objections. In addition, she asserts that repayment of removed Trust assets needs to account for income the Trust would have received if those assets had been left in the Trust, including the tax implications in returning the value of Nucor's dividends to the

---

*Delaware*, 166 A.3d 102 (Del. 2017); *See also In re Estate of Farren*, 131 A.3d 817, 835 (Del. Ch. 2016); *Brandin v. Gottlieb*, 2000 WL 1005954, at *29-*30 (Del. Ch. July 13, 2000).
[28] D.I. 118, at 7.

Trust;[29] the expenditure of $74,000 (the value of the Conectiv stock) to sell $11,500 worth of Texas property is unreasonable and does not obviate the need for Leonard to repay the Trust for the loss caused by the Conectiv stock's removal; and Leonard's initial accounting for the Trust cannot be relied upon because it did not provide an accurate picture and included a mobile home not left to the Trust, combined losses on property (which most likely resulted from the sale of the mobile home, non-Trust property), and cash that was not actually deposited into the Trust.

Leonard next argues that he relied on advice from a Delaware accountant preparing the Trust's first tax return, in valuing all of the stocks at the time of the settlor's death. Mrs. Hurd responds that Leonard delayed establishing the Trust for 16 months after the settlor's death and chose stocks to fund the Trust which transferred losses in the stock (occurring during that period) to the Trust, thereby diminishing the value of the Trust and enhancing the value of the trusts in which Leonard was the current beneficiary. The Master's Report concluded that the trust agreement "provides for the initial funding of the Trust with no less than $500,000 worth of property."[30] Consistent with that Report, the Receiver's report values the stock used to establish the Trust as of the time the Trust was initially funded (except

---

[29] For example, Mrs. Hurd argues that Nucor's returned dividends would be taxable to Mrs. Hurd, and Leonard would be able to reduce his costs by deducting the repayment on his taxes as a loss on transaction. D.I. 119, at 6-7.
[30] *Hurd*, 2016 WL 5340210, at *4.

for the Conectiv stock, which was valued at the settlor's death pursuant to the trust agreement).

Finally, Leonard asserts that the Lonestar Steakhouse and Telemex/American Movil stocks were liquidated as "forced sales," treated as capital gains, and removed from the Trust based upon Leonard's discussions with the settlor and his counsel.[31] This argument was previously rejected in the Master's Report, which found that the trust agreement did not authorize "the trustee to cap the value of the Trust at a maximum of $500,000 or to remove trust assets while the Trust's beneficiary is still alive."[32]

With regard to Leonard's objections and arguments, I find them unpersuasive and, in some instances, inconsistent with the Master's Report. In contrast, the findings of the Receiver's report are reasonable, given the goal of restoring the Trust to the position that it would have been in, absent Leonard's breach. Accordingly, I recommend that the Court reject Leonard's objections and approve the Receiver's report.

## 2. REMAINDER BENEFICIARIES' CONCERNS

Leonard asserts that the remainder beneficiaries have expressed concern about "current receivership actions related to principal liquidation and capital gains distribution and request the court instruct appropriate reporting of all such actions and

_____

[31] D.I. 118, at 8-9.

tax impacts, related to these actions to all beneficiary categories."[33] On December 7, 2017, the Receiver filed an emergency petition for instruction, seeking the Court's approval to liquidate Trust principal, if needed, to pay for Mrs. Hurd's on-going long term care, since she had moved into an assisted living facility and needed to transfer into the facility's memory-impaired unit. The Court approved the Receiver's actions, after seeking the parties' input.[34] I presume that Leonard's expression of concern on behalf of the remainder beneficiaries, of which he is one, relates to these payments from the Trust principal.

The Court's February 10, 2017 order suspending the trustee and appointing the Receiver provides that the Receiver has "all rights, powers and obligations, including all fiduciary obligations, of a trustee under the [trust agreement]."[35] As set forth in the trust agreement, the trustee, or in this instance, the Receiver, has the sole reasonable discretion to make necessary or advisable payments out of Trust principal for Mrs. Hurd's health, education, support or maintenance, if income is not sufficient. The trust agreement also provides that conflicts of interest shall be resolved in the favor of life tenants "at the expense of remaindermen of whatever class."[36]

---

[32] *Hurd*, 2016 WL 5340210, at *5.

[33] D.I. 118, at 9.

[34] D.I. 115 (Dec. 13, 2017). Leonard did not provide a response. Mrs. Hurd's response concurred with the Receiver's request and stated that a court order is not needed for payment of the beneficiary's long-term care from Trust principal, since such payments are in its sole reasonable discretion pursuant to the trust agreement. D.I. 114 (Dec. 13, 2017).

[35] *Hurd*, C.A. No. 4675-MA, § 3 (ORDER).

[36] Tr. Ex. 4, ¶ 6.11.

Therefore, the trust agreement gives preference, to the extent there is a conflict in interest, to Mrs. Hurd over the remainder beneficiaries.[37] Consistent with the trust agreement, I find that the Receiver, or any successor trustee appointed by the Court, has the authority and, in fact, the fiduciary duty, to use trust principal, if needed or advisable, for Mrs. Hurd's health, education, support or maintenance.[38]

## 3. LEONARD'S MOTION FOR RECONSIDERATION OF COERCIVE FINE

On May 26, 2017, Leonard filed a motion for reconsideration of the Court's April 26, 2017 order levying coercive fines, arguing that he has made every effort to produce the requested documents but computer problems, along with the failure of financial companies providing services to the Trust to retain certain financial documents (more than seven years old), prevented his compliance. He asserts the impossibility of compliance makes the fines punitive, rather than coercive, and requests that the Court terminate any past or future accrual of coercive fines under the April 26th order. The motion was stayed pending completion of the Receiver's report. Mrs. Hurd's February 20, 2018 response to Leonard's motion alleges that, although the Receiver was unable to recall the specific date of receipt, the vast majority of

---

[37] A trustee should act in a way that a fair result is reached in the interest of both current and future beneficiaries. *See generally* George Gleason Bogert et al., Bogert's Trusts and Estates § 541 (3d ed. Supp. 2016). It is difficult to see how taking care of Mrs. Hurd's health, support and maintenance needs from Trust principal, if needed, can be seen as unfairly favoring her over the Trust's future beneficiaries, since addressing those needs is within the specific purpose of the Trust.

[38] Reporting requirements for fiscal operations of the Trust are set forth in the trust agreement. Tr. Ex. 4, ¶ 6.12.

outstanding documents was received by the Receiver within a short time of the levying of the coercive fine, the coercive fine served its purpose, and she agreed that no more than the $1,200 fine levied by Master Ayvazian on May 22, 2017 was needed. In Leonard's March 6, 2018 reply, he reiterates that he produced all requested documents available to him by April 7, 2017 and any remaining documents were unavailable to him, making his compliance with the coercive fine order impossible. Given that the parties agree that the bulk of the documents requested by the Receiver were provided by Leonard around the time the coercive fine was levied, I conclude that the purpose for levying the fine was served and recommend that the Court vacate the $1,200 fine referenced by Master Ayvazian in her May 22, 2017 letter to the parties.

## 4. ATTORNEYS' FEES

Leonard requests that his attorney's fees be paid out of Trust funds (by reducing the amount of funds required to be returned to the Trust by those fees' amount). He asserts that the legal fees for Mrs. Hurd are being paid from the Trust, while he is "bearing the financial burden of fees for this case out of personal funds, which is not the intent of the trust structure nor is it common practice."[39]

In trust litigation, the Court has the discretion, "as justice and equity may require," to award reasonable attorneys' fees to any party, to be paid by another party,

---

[39] D.I. 118, at 9.

or from the trust at issue.[40] The general rule is that a trustee is entitled to reasonable attorneys' fees when defending a trust and their own actions as a trustee.[41] Exceptions to that rule focus on whether the trustee acted in bad faith, fraudulently, and depend upon the extent of the trustee's wrongful conduct, and whether their actions benefitted the trust.[42] Leonard has been found to have breached his fiduciary duty to Mrs. Hurd and engaged in self-dealing. His actions were characterized by the Court as "the epitome of bad faith."[43] Given the extent of Leonard's misconduct in this case and the harm that his actions have caused the Trust and Mrs. Hurd, I recommend the Court deny Leonard's request to allow payment of his attorneys' fees associated with this litigation from the funds that he has been ordered to repay the Trust.

## CONCLUSION

For the foregoing reasons, I recommend that the Court reject Leonard's objections, approve the Receiver's report, and order that Leonard pay the Trust $611,971.44 in income, plus any additional income deficiencies that have accrued since September 30, 2017 (when the reporting period for the Receiver's report ended), and $450,559.64 in cash in principal, as well as 6,075 shares of Nucor stock, or cash representing its value on the date that the Trust is repaid for this stock. I

---

[40] 12 *Del. C.* §3584.

[41] *In re Unfunded Ins. Tr. Agreement of Capaldi*, 870 A.2d 493, 496 (Del. 2005); *See e.g., McNeil v. McNeil*, 798 A.2d 503, 515 (Del. 2002).

[42] *McNeil*, 798 A.2d at 514-15.

further recommend that the Court order the full amount of the income due be paid first (prior to the repayment of any principal) within 45 days after this report becomes final, and that all net income owed to the Trust by Leonard be distributed forthwith to Mrs. Hurd upon its payment into the Trust, consistent with the terms of the trust agreement. Principal due shall be paid within six months following the repayment of the income. I make this recommendation in consideration of Mrs. Hurd's age and health concerns, the degree of trustee misconduct over an extended period, as well as the length of time this case has remained in this Court.

I also recommend that the Court grant Leonard's motion for reconsideration of the Court's April 26, 2017 order levying coercive fines on Leonard and vacate the coercive fine against Leonard levied in the amount of $1,200. Finally, I recommend the Court deny Leonard's request to allow payment of his attorneys' fees associated with this litigation from the funds that he has been ordered to repay the Trust.

This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.

---

[43] *Hurd*, C.A. No. 4675-MA, at 50 (TRANSCRIPT).