**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE: THE TRUST FBO SAMUEL | ) | C.A. No. 12904-MG |
| FRANCES duPONT UNDER TRUST | ) | |
| AGREEMENT DATED AUGUST 4, 1936 | ) | |
| (POWER OF APPOINTMENT TRUST) | ) | |
| | ) | |

**MASTER'S REPORT**

Date Submitted: July 31, 2018
Draft Report:
Final Report: September 25, 2018

William E. Manning, Scott W. Perkins, and Selena E. Molina, SAUL EWING ARNSTEIN & LEHR, LLP, Wilmington, Delaware, *Attorneys for Petitioner Martin A. Heckscher*

Todd A. Flubacher and Matthew R. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Respondents Pierre S. DuPont, John E.B. DuPont and Catherine DuPont Varacchi*

Jeffrey S. Goddess, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware, *Guardian Ad Litem for Sean Osborne and Cara Osborne, and Attorney for Amber (Thomas) Ellis*

Gregory J. Weinig, Ryan P. Newell, Scott E. Swenson, and Daniel R. Stanek, CONNOLLY GALLAGHER LLP, Wilmington, Delaware, *Attorneys for Respondent Jennifer Beck*

GRIFFIN, Master

Pending before me is a petition filed by trustees seeking instructions from the Court as to the proper distribution of the principal and income of the trust, which granted the donee a limited testamentary power of appointment. The issue is whether a divorce decree incorporating a settlement agreement in which the donee agreed to exercise his power of appointment to benefit the children of his first marriage, bound the donee and the trust, or whether the donee's last will and testament, which subsequently exercised the donee's power of appointment to benefit his granddaughter from his second marriage, controls. Beneficiaries of the conflicting appointments filed motions for summary judgment in this case asking the Court to determine which exercise of the donee's power of appointment dictates. In the alternative, the children of the donee's first marriage seek a Court finding that the settlement agreement caused a partial release of the donee's power of appointment so that the trust property passed to them as the takers in default at the time of the divorce, or that the inequitable conduct by the donee and the trustee warrants the imposition of a constructive trust over the trust property.

Based upon the reasons set forth below, I find that the settlement agreement incorporated in a Nevada divorce decree does not bind the trust, nor does it represent a partial release of the donee's power of appointment. I also conclude that imposing a constructive trust over the trust property is not appropriate in these circumstances. I recommend that the Court grant the granddaughter's motion for summary judgment

and order the trustee to distribute the trust principal and income consistent with the exercise of the donee's power of appointment in his last will and testament. And, that the Court deny the cross-motion for summary judgment filed by the children of the donee's first marriage. This is a final report.

## I.  Factual background

This matter stems from a trust agreement (the "Trust") entered into on August 4, 1936 between Ernest duPont ("Ernest"), the donor, and A. Felix duPont, Walter Blackson and Delaware Trust Company, a corporation of the State of Delaware, the initial trustees. Ernest created a testamentary power of appointment trust for the initial benefit of his son, Samuel F. duPont ("Sam"), the donee.[1] The Trust directed the trustees to accumulate the net income of the Trust and to invest such accumulations and add them to the Trust during Ernest's life. After Ernest's death in 1944, the trustees were directed to pay over the net income of the Trust as they deemed reasonable and necessary for Sam's support, maintenance and education until he reached 21 years of age.[2] Thereafter the trustees were to pay the net income of the Trust to Sam during his life and, upon his death, to pay over and/or administer the Trust fund and income to benefit such persons as are appointed by Sam, through his

---

[1] Docket Item ("D.I.") 1, Ex. A. I use first names in pursuit of clarity and do not intend any familiarity or disrespect.

[2] *Id*. Ex. A, Art. I §1.

limited power of appointment ("LPOA"), by his last will and testament. The Trust

Agreement detailed the LPOA as follows:

> Upon the death of the said Samuel Francis duPont, the Trustees shall pay over, deliver, dispose of and/or administer the said trust fund, together with all accumulated income thereof if any, unto, and/or for the benefit of, such persons, and/or upon such trusts, as may be limited and appointed by the said Samuel Francis duPont, *in and by his last will and testament*, from among the following individuals and classes of persons, to wit, - his descendants, his widow, his half-sister Alberta duP. Thompson, his half-brother Ernest duPont, Jr., any brothers or sisters or any other half-brothers or half-sisters he may have who are children hereafter born of the said Trustor, the descendants of his said half-sister or his said half-brother or of any such other brothers or sisters, or half-brothers or half-sisters, respectively, and Anne T. duPont, wife of the Trustor.[3]

If Sam failed to exercise the LPOA, then the Trust would be distributed to Sam's

lawful issue in "equal shares per stirpes."[4] The Trust also contained a spendthrift

clause:

> The interest of any beneficiary hereunder, either as to income or principal of the trust fund, shall not be anticipated, alienated, or in any other manner assigned or transferred by such beneficiary, nor shall the same be subject to any legal process, bankruptcy proceeding or the interference or control of creditors or others.[5]

The Trust will terminate twenty-one years after Sam's death with final distributions

to be made to the persons entitled to receive the net income of the Trust at that time –

---

[3] *Id*. (emphasis added).

[4] *Id*.

[5] *Id*. Ex. A, Art. II § 4.

persons either receiving the income through Sam's exercise of the testamentary LPOA or his legal issue if he failed to exercise the LPOA.[6]

Sam was married twice during his lifetime.[7] First, to Helen Hawley Barbey duPont ("Helen") in 1951, with whom he had three children: Pierre S. duPont, Catharine duPont Varacchi, and John E.B. duPont; all three are Respondents in the case (the "duPonts").[8] On June 29, 1962, Sam commenced a divorce action against Helen, claiming extreme cruelty, in the Second Judicial District Court of the State of Nevada in the County of Washoe (the "Nevada Court").[9] Helen responded to the complaint and denied the grounds for the divorce.[10] The Nevada Court had jurisdiction because Sam lived in Nevada for six weeks prior to filing the complaint, making him a *bona fide* resident of Nevada for purposes of obtaining a divorce.[11] There was no evidence that the Trust or its trustees participated in the divorce proceedings.

The Nevada Court granted the divorce and "approved, adopted, and confirmed" the written agreement between Sam and Helen (the "Settlement Agreement"), stating that the Settlement Agreement settles and adjusts "all rights of property of the

---

[6] *Id.* Ex. A, Art. I § 2. The Trust will terminate on August 3, 2036.

[7] D.I. 1 ¶¶ 9,10.

[8] *Id.*; *see also*, D.I. 67, Ex. 4, at 1.

[9] D.I. 47 ¶ 5.

[10] D.I. 67, Ex. 4, at 3.

[11] *Id.* Ex. 5, at 1.

4

parties."[12]  Sam and Helen were divorced by decree on July 19, 1962.[13]  In paragraph

five of the Settlement Agreement, Sam agreed to irrevocably exercise the LPOA in

the Trust in favor of the duPonts:

> 5. EXERCISE OF POWER OF APPOINTMENT IN FAVOR OF ISSUE OF THIS MARRIAGE:  Under a certain deed of trust entered into between Ernest duPont on the one hand, and Walter Blackson and Delaware Trust Company on the other hand, on August 4, 1936, said instrument creating what is commonly known as a "spendthrift trust", (Exhibit A), Husband is given the limited power to appoint by will to certain individuals and classes of persons entitled to receive the corpus of said trust upon his death; and the said children born of the marriage between Husband and Wife are of said class of persons entitled to receive the entire corpus of said trust fund. *Husband hereby irrevocably and without condition covenants and agrees, except as hereinafter stated, to exercise the power of appointment conferred upon him in said deed of trust and to make an appropriate testamentary instrument implementing this Agreement, appointing Pierre S. duPont, Catharine Ann duPont and John E. B. duPont*, his children born of this marriage, as the persons to whom Trustees shall pay over and deliver absolutely upon Husband's death the entire trust fund, free of any trust, in equal shares. . .[14]

The Settlement Agreement further stated that its provisions shall be governed by

Delaware law.[15]  On July 16, 1962, Sam executed a will that exercised the limited

---

[12] *Id*. Ex. 5, at 2-3.  Initially, Beck denied the existence of such a Settlement Agreement because the document submitted into evidence 1) was a copy of the agreement, not the original, 2) was not signed by any of the named parties, 3) contained many scribbled out provisions and hand written notations, and 4) was not attached to the petition.  D.I. 7, at 2. This issue was addressed in the duPonts' Amended Verified Counterclaim with the submission of a final, signed copy of the Settlement Agreement. D.I. 47, Ex. B.

[13] *Id*. Ex. 5, at 3.

[14] D.I. 1, Ex. G, ¶ 5 (emphasis added).

[15] D.I. 67, Ex. 4, ¶ 12(e).

power of appointment in favor of the duPonts, which was included as an attachment to the Settlement Agreement.[16]

On July 19, 1962, the same day as the divorce, Sam married Joanne Smith Jeffries ("Jan") and, on May 9, 1963, he adopted her two children from a prior marriage, now known as Diane duPont Beck ("Diane") and Richard DuPont ("Richard").[17] The family lived at the family farm, Hexton, in Georgetown, Maryland. Of Sam and Jan's legal issue, Diane's daughter Jennifer D. Beck ("Beck") is the only one to enter an appearance in this proceeding. Sam and Jan remained married until Jan's death on June 29, 2010.

Sam executed a number of wills following the 1962 divorce and before his death in 2015.[18] Sometime after the 1962 divorce, Sam determined that he wished to exercise his LPOA differently than as agreed-upon in the Settlement Agreement.[19] Around 1995, Sam and Jan approached Heckscher about preparing new wills for

---

[16] D.I. 67, Ex. 4, Attach.

[17] D.I. 1 ¶ 10.

[18] Sam's wills and codicils to his wills in the record include, in addition to the one in 1962, wills he executed in 1967, 1976, 1980, 1983, 1995, 1996, 2005, 2008, and 2015, and codicils to wills he executed in 1981, 1994, 1995, and 1996. *See* D.I. 67, Exs. 14-17, 22, 24, 25, 27, 32, and 43.

[19] In his 1976 will, Sam exercised the LPOA for the Trust in favor of the duPonts, while his 1980 will exercised the LPOA to give Jan income from the Trust for life and the residue to Diane and Richard. *Id.* Exs. 15, 16. His subsequent wills varied his approach regarding his exercise of the LPOA, with one giving a lifetime interest in Trust income to Jan with the residue to the duPonts, although his general approach after 1983 was to benefit Jan and their issue. *See id.*, Ex. 22.

6

them and Heckscher began serving as their personal attorney for estate planning.[20]

Unsure as to the effect of paragraph five of the Settlement Agreement, Heckscher recommended that Sam obtain advice from a Delaware lawyer to determine if Sam was bound by paragraph five of the Settlement Agreement.[21] Sam obtained a legal opinion from Henry Herndon (the "Herndon Opinion") which concluded that paragraph five of the Settlement Agreement was invalid and not enforceable against the Trust, although it noted that there was no controlling Delaware precedent.[22] Additionally, the Herndon Opinion noted that Helen or the duPonts may be able to recover against Sam's estate if he did not adhere to the Settlement Agreement by exercising his LPOA in favor of the duPonts.[23]

---

[20] D.I. 71, Ex. C, Heckscher Dep. Tr. 54: 2 - 55: 8. Heckscher began serving as co-trustee of the Trust in 1983 and remained as co-trustee of the Trust throughout the time he also served as Sam's and Jan's estate attorney. *Id.* Ex. C, Heckscher Dep. Tr. 18: 19 - 19: 2.

[21] *Id.* Ex. C., Heckscher Dep. Tr. 91: 21 - 92: 22.

[22] D.I. 67, Ex. 30, at 8. The Herndon Opinion stated that "Delaware caselaw is consistent in holding that the donee of a power of appointment may only exercise that power in the manner and in whose favor the governing instrument prescribes." *Id.* Ex. 30, at 6. It concluded that Sam had no power under the Trust to make an enforceable contract concerning exercising his appointment. And, it opined that the divorce decree is not "enforceable against the Trustees of the Trust or those who ultimately may be [Sam's] testamentary appointees," and the Nevada court "had no jurisdiction over the trust property that is the subject of the power of appointment," or over the ultimate beneficiaries of the exercise of the power under Sam's last will and testament. *Id.* Ex. 30, at 7. On July 15, 2015, Sam received another opinion from a Delaware law firm confirming the advice provided in the Herndon Opinion. *Id.*, Ex. 46.

[23] *Id.* Ex. 30, at 8.

On March 13, 2015, Sam executed his Last Will and Testament ("Last Will").[24] In article five of his Last Will, Sam exercised his LPOA in favor of Beck, left $250,000 outright to Ernest E. Beck III (Diane's son), and instructed the trustees to hold the remaining principal in trust and distribute Trust income to Beck, with the discretion to distribute principal for the maintenance and upkeep of Hexton Farm and to Beck for certain purposes, and to terminate the Trust and distribute the remaining principal to Beck or, if she is not living, to her then-living descendants, upon the 21st anniversary of his death.[25] The duPonts were only listed as remote contingent beneficiaries.[26] Sam died on August 3, 2015.[27]

## II. Procedural background

Petitioners Martin Heckscher ("Heckscher") and Edward D.E. Rollins, III, successor personal trustees for the Trust, filed a petition for declaration of rights and instructions, on November 15, 2016, seeking guidance from this Court whether the Trust should be distributed according to Sam's exercise of the LPOA in the

---

[24] D.I. 1, Ex. F. There is some confusion as to the date of Sam's Last Will (the Petition dates the Last Will's execution on May 13, 2015, and the notary on the Last Will indicates that Sam and the witnesses signed the Last Will before her on March 13, 2015); however, any discrepancy in the execution date is not material for purposes of this action.

[25] D.I. 1, Ex. F, Art. V.

[26] *Id.* Ex. F, Art. V.

[27] *Id.* ¶ 1.

8

Settlement Agreement or according to his Last Will.[28]   On January 6, 2017, Beck

filed an answer and claim for relief, arguing that this Court should distribute the Trust

according to Sam's Last Will.[29]   The duPonts filed a response and counterclaim on

January 6, 2107, and an amended counterclaim on January 10, 2018, seeking

distribution of the Trust property to them because of the Settlement Agreement.[30]   All

three parties asked the Court to allow payment of their attorneys' fees and costs from

the Trust.

On October 2, 2017, Heckscher filed a motion for judgment on the pleadings,

but that motion was withdrawn without prejudice on January 8, 2018.[31]   Both Beck

and the duPonts filed motions for summary judgment on April 24, 2018.[32]

The duPonts argue, in their motion for summary judgment, that the Trust

property should be distributed in accordance with the Settlement Agreement, since its

validity was determined by the Nevada court's divorce decree, and is entitled to full

---

[28] Edward D.E. Rollins, III was serving as co-trustee at the time the petition was filed but subsequently resigned, effective December 31, 2016, and is no longer a co-trustee. *See* D.I. 71, Ex. C, at 53.  Initially, there was an issue in this action concerning who would inherit if the Trust property passed to the takers in default, but that issue was resolved in a companion income trust case (C.A. No. 12905-MG) and there is no need to address it here.

[29] D.I. 7 ¶¶ 4-5.

[30] In the alternative, the duPonts argue that there was a partial release of the LPOA, or that a constructive trust should be imposed. D.I. 47 ¶¶ 41-45.

[31] D.I. 45.

[32] D.I. 63; D.I. 65.

9

faith and credit in Delaware.[33] They contend relitigating that issue is barred by *res judicata*, and also that Heckscher or Beck are barred by unclean hands and laches from collaterally attacking the divorce decree.[34] Alternatively, the duPonts assert the Settlement Agreement acted as a partial release of the LPOA in their favor, or that Sam's and Heckscher's inequitable conduct, including Heckscher's breach of his duties of impartiality and disclosure, warrants the imposition of a constructive trust over the Trust assets.[35]

In her motion for summary judgment, Beck argues the Trust property should be distributed in accordance with Sam's exercise of the LPOA in his Last Will, consistent with Ernest's intent that the property pass by testamentary appointment. She asserts that, under longstanding Delaware law, the Trust property is not within the donee's control, thus contracts to exercise powers of appointment, such as paragraph five of the Settlement Agreement's provision, are void. In addition, she refutes the duPonts' claims regarding full faith and credit, collateral attack, and unclean hands and laches, and argues the Trust's spendthrift clause nullifies Sam's

---

[33] D.I. 67, at 37-39.

[34] *Id.* at 39-40, 44-47. The duPonts also argue that Beck and Heckscher do not have standing to collaterally attack the divorce decree since they were not parties to the divorce proceedings. *Id.* at 43.

[35] *Id.* at 50-53, 55-58. The duPonts first argued that Heckscher's purported misconduct – his alleged breach, as a trustee, of his duty of impartiality and of disclosure – supported the imposition of a constructive trust for their benefit in their motion for summary judgment. *Id.* at 56-58.

agreement to exercise the LPOA in the Settlement Agreement.[36]  Further, Beck disputes the duPonts' arguments that the Settlement Agreement was a partial release of the LPOA, or that a constructive trust should be imposed.

In his June 5, 2018 answering brief to the duPonts' motion, Heckscher reiterates Beck's arguments that the divorce decree is not binding on the Trust or its trustees, and full faith and credit, *res judicata* and collateral estoppel do not apply in this case; this is not a collateral attack; the Trust's spendthrift clause prevents the duPonts from reaching Trust property to satisfy their claims; the Settlement Agreement was not a release; and the duPonts are not entitled to a constructive trust.[37] In addition, Heckscher contends the duPonts' affirmative defenses of laches or unclean hands are precluded because they were not plead and, in turn, that the duPonts' claims are barred by laches and claim preclusion.[38]

Following completion of briefing by the parties on July 20, 2018, I heard oral arguments on this case on July 31, 2018 and reserved my decision.

## III.    Standard of Review

Under Court of Chancery Rule 56, the court grants a motion for summary judgment when "the moving party demonstrates the absence of issues of material fact

---

[36] D.I. 72, at 23-25, 38-39.

[37] D.I. 71, at 22-23, 28-29, 32-33.

[38] *Id.* at 28-34, 45-47.

and that it is entitled to a judgment as a matter of law."[39] The moving party bears the burden of demonstrating that no material issues of fact are in dispute and that it is entitled to judgment as a matter of law.[40] Once the moving party has satisfied that burden, it falls on the non-moving party to show that there are factual disputes. Evidence must be viewed "in the light most favorable to the non-moving party."[41]

When the court is presented with cross-motions for summary judgment, "neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[42] In evaluating cross-motions for summary judgment, the court examines each motion independently and only grants a motion for summary judgment to one of the parties when there is no disputed issue of material fact and that party is entitled to judgment as a matter of law.[43]

---

[39] *Wagamon v. Dolan*, 2012 WL 1388847, at *2 (Del. Ch. Apr. 20, 2012); *see also Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *2 (Del. Ch. Sept. 3, 1996), *aff'd*, 692 A.2d 411 (Del. 1997).

[40] *Wagamon*, 2012 WL 1388847, at *2; *Lundeen v. Pricewaterhousecoopers, LLC*, 2006 WL 2559855, at *5 (Del. Super. Aug. 31, 2006).

[41] *Williams v. Geier*, 671 A.2d 1368, 1388-89 (Del. 1996) (citing *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99 (Del. 1992)).

[42] *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del. 1988) (citing *Wilson v. Joma, Inc.,* 537 A.2d 187, 188 (Del. 1988)).

[43] *Cf. Empire of Am. Relocation Servs., Inc.*, 551 A.2d at 435 ("[i]t is imperative that the court consider whether there is a genuine issue of material fact each time such motions are presented"); *New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 744 (Del. Ch. 2013), *aff'd,* 105 A.3d 990 (Del. 2014) (citing *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166-67 (Del. Ch. 2003); *Wimbledon Fund LP v. SV Special Situations LP*, 2011 WL 378827, at *7 (Del. Ch. Feb. 4, 2011).

## IV. Analysis

### A. Sam's exercise of the LPOA in the 1962 Settlement Agreement did not bind the Trust

The central issue is whether Sam's exercise of the LPOA in favor of the duPonts in the Settlement Agreement, or in his Last Will, in which he appointed Beck as primary beneficiary of the Trust upon his death, controls. If the Settlement Agreement irrevocably bound Sam and the Trust, then any subsequent actions by Sam to exercise the LPOA, including his Last Will, are irrelevant. If it did not, under the facts of this case, Sam's exercise of his testamentary LPOA in his Last Will is determinative.

The Trust and the Settlement Agreement are both governed by Delaware law, and a contract to exercise a testamentary power of appointment[44] is not valid in Delaware. The seminal case addressing this issue is *Estate of Tigani*.[45] After indicating that the question of whether a contract to exercise a testamentary power of appointment is valid appears to be an issue of first impression, then Master LeGrow

---

[44] A power of appointment is authority "to designate recipients of beneficial interests of property," and a power can be general, in which the donee may appoint to anyone, including his own estate or creditors, or non-general or limited, in which the donor may limit to whom the donee may appoint. *See generally Dickinson v. Wilmington Trust Co.*, 734 A.2d 605, 609 (Del. Ch. Feb. 5, 1999). With a testamentary power of appointment, the donee is required to exercise the power of appointment in his last will and testament. *See generally Raymond L. Hammond Irrevocable Tr. Agreement*, 2016 WL 359088, at *6 (Del. Ch. Jan. 28, 2016) ("[t]he Power of Appointment was testamentary, meaning [the donee] only could execute it through his last will and testament").

[45] 2016 WL 593169 (Del. Ch. Feb. 12, 2016).

13

in *Tigani* concluded that such contracts are not valid, with limited exceptions. She noted that it is presumed that a donor who creates a testamentary power of appointment, or any power that is not presently exercisable, intends that "the selection of the appointees and the determination of the interests they are to receive is to be made in light of the circumstances that exist on the date the power becomes exercisable."[46] Or, that the "donor essentially requires the donee to 'wait and see' and take into account later developing facts before exercising the power."[47] Therefore, contracting away that power defeats the donor's intent by eliminating the donee's ability to change the appointment at any time prior to his death. And, in Delaware, the donor's intent controls.[48] Further, a contract to exercise a testamentary power of appointment involves a property interest "to which the donee has no claim and . . . cannot dispose of during [his] lifetime."[49]

---

[46] *Id.* at \*17 (citation omitted).

[47] *Id.*

[48] *See, e.g., Chavin v. PNC Bank*, 816 A.2d 781, 783 (Del. 2003) ("[t]he cardinal rule of law in a trust case is that the intent of the settlor controls the interpretation of the instrument") (citation omitted); *In re Tr. Under Will of Flint for the Benefit of Shadek*, 118 A.3d 182, 194 (Del. Ch. 2015); *In re Will of Fleitas*, 2010 WL 4925819, at \*4 (Del. Ch. Nov. 30, 2010).

[49] *Estate of Tigani*, 2016 WL 593169, at \*18. If a contract to appoint is enforceable, then the donee could confer a current benefit on himself in exchange for the remainder interest, which he has no right to enjoy. *Id.; see also Dickinson*, 734 A.2d at 610 n.5 ("[t]he rule in Delaware at common law is that property subject to a power of appointment, even one general as to appointees, is not part of the estate of the person possessing the power"). The *Dickinson* Court also noted that other jurisdictions had concluded that "the holder of a testamentary power cannot effectively contract to appoint by will in favor of any particular person and that a creditor who makes such a bargain and is disappointed has, 'by virtue of his contract, no equitable lien or other interest' in the property subject to the power." *Id.*

14

In this case, Ernest clearly evidences his intent that Sam could not exercise the power of appointment until his death – or through his last will and testament. The duPonts argue that *Tigani* is irrelevant and factually distinguishable because *Tigani* issued in 2016 – 54 years after the Settlement Agreement was incorporated into, and validated, by a court order entitled to full faith and credit.[50] I disagree. The Court's holding in *Tigani* may have addressed an issue of first impression but it followed long-standing legal principles that were identified in the Herndon Opinion. Those principles emanated from caselaw cited in the Herndon Opinion, much of which predated the 1962 Settlement Agreement.[51] And, since the Trust property remained the donor's – or Ernest's, Sam had no property interest that he could bargain away during his lifetime. The duPonts failed to show any change in the law or reason why these legal principles, which focus on the primacy of the donor's intent and were so eloquently explained in *Tigani*, would not also have applied in 1962.

Although the factual circumstances in *Tigani* may differ, I find the longstanding legal principles that serve as the underpinning for the *Tigani* holding – that the donor's intent governs the Trust and if the donor provided for a testamentary LPOA, contracts entered into by the donee concerning the exercise of his LPOA are usually unenforceable because the donee has no rights in trust property to bargain

---

[50] D.I. 67, at 47-48.

[51] *See id.* Ex. 30.

away – control in this case.[52] Sam's exercise of the LPOA in the Settlement Agreement was legally ineffective because the property he was trying to bind was not his to encumber and the contract to appoint in the Settlement Agreement was not valid and binding on the Trust. But, Sam, in exercising the LPOA contrary to the Settlement Agreement's provisions through his Last Will, breached that Agreement, even if he had his reasons for doing so.[53] The duPonts, as third-party beneficiaries under the Settlement Agreement, could seek restitution from Sam (and Sam's property) for that breach. Accordingly, I conclude that, consistent with the donor's

---

[52] Another Delaware case considered the effect of a settlement agreement, incorporated into a divorce decree in another state, on a trust and, although the factual situation in that case was different, the court's analysis is helpful to review. In *Raymond L. Hammond Irrevocable Tr. Agreement*, the donor agreed to make his ex-spouse the lifetime beneficiary of the trust under a settlement agreement that was incorporated into a New Jersey divorce decree. 2016 WL 359088, at *3. The donor failed to properly exercise the LPOA consistent with the formalities in the trust. The Court found that the testamentary power of appointment in the trust could only be executed through the donor's last will and testament, and since the settlement agreement was not a testamentary document, it could not rescue the donor's ineffective exercise of the power. *Id.* at *6. The *Hammond* Court supported the approach that, despite a divorce decree in which the parties agreed that the ex-spouse would remain a trust beneficiary during her lifetime, the donor's intent controlled and the decree did not bind future trust operations. *Id.; see also O'Hara v. O'Hara*, 44 A.2d 813, 815 (Md. 1945) (finding that a settlement agreement ratified by a divorce decree in which the donee contracts away the exercise of a testamentary power of appointment is not enforceable in equity because "to permit him to bargain that right away would be to defeat the purpose of the donor").

[53] In his deposition, Heckscher testified that Sam's reasons for altering the LPOA exercise were that he wanted to preserve the family farm, Hexton Farm, and to use Trust assets to maintain it since he had no assets of his own; he was afraid that the duPonts would sell the farm; he wanted to benefit the persons, including Beck, who supported him in his life; and he felt the duPonts were extremely wealthy from trust funds received through their mother and would not need any money that he might provide. D.I. 67, Ex. 50, Heckscher Dep. Tr. 77: 10 - 79: 19; D.I. 72, Ex. 7, Heckscher Dep. Tr. 81: 10-19.

intent, Sam's exercise of the testamentary LPOA in his Last Will in favor of Beck controls the distribution of the Trust property.

**B. Full faith and credit, *res judicata* and collateral estoppel do not apply to preclude Sam's exercise of the LPOA in his Last Will**

The duPonts assert that the *Tigani* holding does not apply here because *Tigani* did not involve a contract that was incorporated into a final order of court, which entitled it to full faith and credit in Delaware. Therefore, the duPonts claim that any subsequent actions concerning its validity are barred by *res judicata* and relitigating "substantive issues, if precluded by Nevada law, is reversible error."[54] Beck responds that the full faith and credit claim fails, because the Nevada court did not have personal or *in rem* jurisdiction over the Trust, its trustees or Sam's unborn beneficiaries, did not apply Delaware law concerning the validity of the LPOA exercise in the Settlement Agreement, and the Agreement was "merely blessed" by the Nevada Court and not vetted in "fully and fairly litigated adversarial proceedings."[55] Further, Heckscher asserts that full faith and credit, *res judicata* and collateral estoppel do not apply in this case because, by its terms, the divorce decree binds only Sam and Helen; neither the Trust nor any trustee was made a party to the

---

[54] D.I. 67, at 41.

[55] D.I. 72, at 25.

17

Nevada action; and the enforceability of paragraph five of the Settlement Agreement was never considered by the Nevada court.[56]

Under the United States Constitution and the Full Faith and Credit Act ("FFCA"), every state is expressly required to treat a judgment of another state with the same respect that it would receive in a court of the rendering state.[57] The FFCA has "long been understood to encompass the doctrines of *res judicata*, or 'claim preclusion' and collateral estoppel, or 'issue preclusion.'"[58] *Res judicata*, or claim preclusion, bars all claims that were litigated or could have been litigated in the earlier action.[59] For *res judicata* to bar a subsequent action under Delaware law, five factors must apply: (1) the court making the prior adjudication had jurisdiction; (2) the parties in the current action are either the same parties or in privity with the parties in the prior action; (3) the prior adjudication was final; (4) the causes of action and the issues decided were the same in both cases; and (5) the issues were decided adversely to the petitioners' contentions in the current case.[60] The doctrine of *res*

---

[56] D.I. 71, at 22-23.

[57] *See In the Matter of Vale for Asche*, 2013 WL 3804584, at *8 (Del. Ch. July 19, 2013) (citing U.S. Const. art. IV § 1, the Full Faith and Credit Act, 28 U.S.C. §1738, and *Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 373 (1996)); *Matter of Vale*, 2015 WL 721038, at *3 (Del. Ch. Feb. 19, 2015).

[58] *In the Matter of Vale for Asche*, 2013 WL 3804584, at *8.

[59] *O'Marrow v. Roles*, 2013 WL 3752995, at *3 (Del. Ch. July 15, 2013).

[60] *Cf. RBC Capital Markets, LLC v. Educ. Loan Tr. IV*, 87 A.3d 632, 643 (Del. 2014); *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *17 (Del. Ch. May 10, 2018); *O'Marrow,*

18

*judicata* is based upon the public policy against claim splitting – that a subsequent claim is barred if a plaintiff could have presented it, in its entirety, in the prior forum.[61]

*Res judicata* applies if the same parties are involved in both lawsuits and, under Delaware law, it applies regarding others in the later suit who are in privity with the original parties. The key factor in determining privity is "whether the interests of a party to the first suit and the party in question in the second suit are aligned."[62] And, the test of "privity is whether there is a 'close or significant relationship *between successive defendants'* (emphasis included)."[63] If all of the *res judicata* factors are met, a settlement approved by a court "has the same *res judicata* effect as a final judgment on the merits."[64] For collateral estoppel, a judgment in a prior suit operates to preclude relitigation of a factual issue which was litigated and decided in a prior

2013 WL 3752995, at *3; *Grunstein v. Silva*, 2012 WL 3870529, at *7 (Del. Ch. Aug. 24, 2012); *Levinhar v. MDG Med., Inc.*, 2009 WL 4263211, at *7 (Del. Ch. Nov. 24, 2009).

[61] *Maldonado v. Flynn*, 417 A.2d 378, 382 (Del. Ch. 1980). Delaware has adopted the transactional approach to *res judicata*, which permits the doctrine to be invoked between the same parties "if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication," and if the defendant shows that the plaintiff, in fairness, should have asserted those claims in the first action. *Id.* at 381; *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 193-94 (Del. 2009).

[62] *Levinhar*, 2009 WL 4263211, at *8; *Grunstein*, 2012 WL 3870529, at *8.

[63] *Grunstein*, 2012 WL 3870529, at *2; *Levinhar*, 2009 WL 4263211, at *8 (citation omitted).

[64] *Schlaeppi v. Delaware Tr. Co.*, 525 A.2d 562, 565 (Del. Ch. 1986), *aff'd*, 523 A.2d 981 (Del. 1987); *O'Marrow*, 2013 WL 3752995, at *3 ("[t]o the extent that the parties resolved certain issues by settlement in the previous action, they are bound by their agreement and any breach of that agreement is subject to enforcement by this Court").

suit between the same parties or their privies, in a subsequent suit on a different cause of action.[65]

However, when applying the preclusion analysis to a judgment from another state, the foreign judgment should be given the same effect "that it has in the state of rendition with respect to the persons, the subject matter of the action and the issues involved."[66] So, in this case, we must look to Nevada law – the state which rendered the divorce decree – to determine whether that state would conclude that *res judicata* or collateral estoppel bars this subsequent litigation. Nevada law is relatively similar to Delaware law – Nevada courts apply a three-part test for determining whether claim preclusion, or *res judicata*, bars subsequent litigation, if the defendant in the subsequent action demonstrates that "(1) there has been a valid, final judgment in a previous action; (2) the subsequent action is based on the same claims or any part of them that were or could have been brought in the first action; and (3) the parties or their privies are the same in the instant lawsuit as they were in the previous lawsuit, *or* the defendant can demonstrate that he or she should have been included as a defendant in the earlier suit and the plaintiff fails to provide a 'good reason' for not having done so."[67] In Nevada, issue preclusion applies to issues that were actually

---

[65] *Cf. Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991); *O'Marrow*, 2013 WL 3752995, at *3.

[66] *In re Wickes Tr.*, 2008 WL 4698477, at *5 (Del. Ch. Oct. 16, 2008).

[67] *Weddell v. Sharp*, 350 P.3d 80, 81 (Nev. 2015). This test, and the use of the terms claim and issue preclusion as the "proper terminology in referring to these doctrines," was

20

and necessarily litigated in prior litigation and on which there was a final decision on the merits.[68] The difference between claim and issue preclusion was explained by the Nevada Supreme Court as follows: claim preclusion applies to preclude completely a second suit based on the same set of facts and circumstances as the first suit, while issue preclusion prevents relitigation of a "specific issue that was decided in a previous suit between the parties, even if the second suit is based on different causes of action and different circumstances."[69]

The mandate of full faith and judgment for judgments imposed in other states is limited to those judgments for which *res judicata* or collateral estoppel would be given effect in the rendering state. I do not find that, under either Nevada or Delaware law, *res judicata* or collateral estoppel bar this Court's consideration of

---

originally adopted by the Nevada Supreme Court with a different privity requirement – that the parties or their privies are the same in both suits. *Five Star Capital Corp. v. Ruby*, 194 P.3d 709, 713 (Nev. 2008). A privy (or person in privity) had been defined in an earlier Nevada Supreme Court case as "one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase." *Paradise Palms Cmty. Ass'n v. Paradise Homes*, 505 P.2d 596, 599 (Nev. 1973). The privity requirement espoused in *Five Star Capital Corp. v. Ruby* was subsequently modified to incorporate the principles of nonmutual claim preclusion. *Weddell*, 350 P.3d at 81.

[68] *Five Star Capital Corp.*, 194 P.3d at 713. The specific factors to apply for issue preclusion are: "(1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation, and (4) the issue was actually and necessarily litigated." *Id.*

[69] *Id.* at 713-14.

whether Sam's exercise of the LPOA in the Settlement Agreement, which was incorporated into the 1962 divorce decree, is enforceable against the Trust.

Here, the duPonts argue the doctrine of *res judicata* bars this litigation, but they have not demonstrated that the petitioner in this action, the trustee, or the Trust, were parties or in privity to a party in the earlier action, or that the principles of nonmutual claim preclusion, as adopted by Nevada, have been met.[70] Sam and Helen were the parties in the 1962 divorce proceedings and the only persons whom the divorce decree states were bound by the decree. There is no evidence the Trust was brought into the divorce action or that the Nevada court had jurisdiction over the Trust, its trustees, or its contingent beneficiaries. The Settlement Agreement, by its terms, pertained to the parties' property rights and Sam had no claim to – or property interest in – the LPOA. And, the duPonts have not shown that the Trust was in privity with Sam (under Nevada law, that its interests arose, after the 1962 divorce decree, through "inheritance, succession, or purchase" from Sam), nor have they shown that the principles of nonmutual claim preclusion apply in this case. Further,

---

[70] The duPonts cite *Pyott v. Louisiana Mun. Police Employees' Ret. Sys.*, 74 A.3d 612, 616 (Del. 2013), as support for their position here. D.I. 67, at 41. *Pyott* is distinguishable from this case. In *Pyott*, the Delaware Supreme Court held that a Delaware derivative complaint should be dismissed after a California federal court entered a final judgment on essentially the same complaint brought by different stockholders. *Pyott*, 74 A.3d at 614. Although there are other differences as well, it is pertinent that the Delaware Supreme Court found that, under controlling California law, the derivative stockholders were in privity with each other, so the privity requirement for issue preclusion was satisfied, unlike the situation here. *Id.* at 617.

at the time of the 1962 divorce decree, Sam's interests were not aligned with the Trust's concerns – Sam wanted to come to an agreement with Helen to enable him to end his first marriage so that he could enter into his second marriage, while the Trust's focus was on carrying out the donor's intentions and protecting the interests of current or future beneficiaries. Ernest intended that Sam exercise the testamentary LPOA at the end of his life, which is in direct conflict with the Settlement Agreement. Therefore, based upon the failure to show that the privity requirement for *res judicata* has been met, the Nevada divorce decree incorporating the Settlement Agreement is not entitled to full faith and credit in Delaware.[71] Similarly, any claim

---

[71] Beck and Heckscher cite *Lewis v. Hanson*, 128 A.2d 819 (Del. 1957), *aff'd sub nom. Hanson v. Denckla*, 357 U.S. 235 (1958), and *Hanson v. Denckla*, 357 U.S. 235 (1958), which highlight that full faith and credit does not apply when a foreign court entering an initial judgment had no jurisdiction over a Delaware trust or trustee and when, under the foreign court's state law, a trustee is an indispensable party to litigation involving the validity of the trust. In those cases, Florida courts decided that property of a Delaware trust passed under the residuary clause of the donor's will, which was admitted to probate in Florida. The Delaware Supreme Court refused to give full faith and credit to the Florida judgment, holding that the property passed under the donor's exercise of her power of appointment in the trust and the Florida court did not have jurisdiction over indispensable parties – the Delaware trustee or the trust property. *Lewis*, 128 A.2d at 834-35. The United States Supreme Court concurred with the Delaware Supreme Court, holding that the Florida court had no jurisdiction over indispensable parties and, consequently, was without jurisdiction to determine the validity of the trust. The U.S. Supreme Court said "[s]ince a State is forbidden to enter a judgment attempting to bind a person over whom it has no jurisdiction, it has even less right to enter a judgment purporting to extinguish the interest of such a person in property over which the court has no jurisdiction." *Hanson*, 357 U.S. at 250. Those cases are factually distinguishable because the Delaware trustee, in those cases, was named as a party in both the Florida and Delaware proceedings and the issue was whether the Florida court had jurisdiction over the trustee so that its judgment could bind them. Here, not only did Nevada court not have personal jurisdiction over the non-resident trustees or *in rem* jurisdiction over Trust property, but the Trust was not a party, nor in privity with a party, in the original Nevada divorce action.

that the Nevada court's judgment is entitled to full faith and credit in this case based upon collateral estoppel fails. Again, the privity requirement is lacking under both Nevada and Delaware law, which is required for *res judicata* and collateral estoppel.[72]

### C. This action is not a collateral attack, and the doctrines of unclean hands and laches do not apply

I also find that this action is not a collateral attack on the Nevada divorce decree. A collateral attack is an attempt to "avoid, defeat, evade, or deny the force and effect of a final . . . judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial."[73] This action is not an attack on the divorce itself, or on Sam's actions related to the Settlement Agreement; instead, the Trust is seeking to determine the effect of Sam's agreement to exercise the LPOA on the Trust.[74] I concur with Heckscher's argument that it would not result in good

---

[72] Beck and Heckscher also assert that the validity of the LPOA exercise was never vetted in fully and fairly litigated adversarial proceedings, so the judgment, as relates to that issue, is not entitled to full faith and credit. The only evidence that the LPOA exercise was adjudicated by the Nevada court was that the Settlement Agreement containing that provision was incorporated into the divorce decree, or final judgment of that Court. Given that the duPonts' full faith and credit argument fails due to the absence of privity, I do not need to address this issue.

[73] *Matter of Vale*, 2015 WL 721038, at *4; *In the Matter of Vale for Asche*, 2013 WL 3804584, at *5 (citation omitted).

[74] This not a case where an ex-spouse is contesting the validity of the divorce decree itself, or where one of the parties or their privies are trying to relitigate issues previously adjudicated in the divorce action. *Cf. Madden v. Cosden*, 314 A.2d 128, 131 (Md. 1974) (the Maryland Court of Appeals affirmed the circuit court's refusal to allow a third party to collaterally attack, or seek the invalidation of, a Nevada divorce decree, which, if

public policy if trusts are deemed to have mounted a collateral attack, and precluded from challenging foreign court actions affecting them, where they had no knowledge of, or involvement in, the earlier court proceedings.[75]

The duPonts also argue that Heckscher and Sam are barred by the doctrines of unclean hands and laches from collaterally attacking the decree related to Trust assets because the Trust failed to challenge Sam's exercise of the LPOA in the Settlement Agreement for the more than fifty years (even after learning about the Herndon Opinion's advice that the Settlement Agreement was unenforceable as to the LPOA), and that Heckscher's inaction has had consequences. Beck claims unclean hands or laches are irrelevant because nothing Sam or Heckscher did could affect the primacy

---

invalidated, would have resulted in a finding that the children from a subsequent marriage were not lawful heirs and precluded from sharing in the trust distributions); *Spilsbury v. Spilsbury,* 553 P.2d 421, 422 (Nev. 1976) (the Nevada Supreme Court affirmed a lower court's denial of a motion to vacate a divorce decree by a spouse under *res judicata*, because an issue adjudicated in an earlier action "cannot be disputed in a subsequent suit between the same parties or their privies").

[75] Beck claims that the spendthrift clause in the Trust, which provides that current or anticipated Trust property cannot be "subject to any legal process . . . or interference or control of creditors or others," invalidates Sam's attempt to contract to exercise the LPOA, and also offers further proof concerning Ernest's intent and Delaware's "nullification of contracts to exercise powers of appointment." D.I. 72, at 23. Heckscher concurs, arguing the spendthrift clause prevents the duPonts, third-party beneficiaries of the Settlement Agreement and creditors, from reaching Trust property to satisfy their claims. D.I. 71, at 31-32. The duPonts respond that their claims do not arise as judgment creditors but their status as "takers in default and permissible appointees of the LPOA," and the Trust's spendthrift clause does not preclude them from seeking redress under the Settlement Agreement. D.I. 75, at 4. Since I have concluded that Sam's exercise of the LPOA in the Settlement Agreement is not enforceable against the Trust, there is no need for me to address the issue concerning the effect of the spendthrift clause on the LPOA exercise in the Settlement Agreement.

25

of Ernest's intent; Sam could not bargain away what was Ernest's property, pursuant to longstanding Delaware law. Heckscher responds that the collateral attack claim is a red herring contrived as a platform to assert laches and unclean hands, and that those affirmative defenses were not plead and are waived.

Under the unclean hands doctrine, equitable relief is denied "where the litigant's own acts offend the very sense of equity to which the litigant appeals," if that inequitable conduct relates directly to the underlying litigation.[76] The unclean hands doctrine is invoked when a litigant's acts "threaten to tarnish the Court's good name," and not as a "means to aid a party who faces an unscrupulous opponent."[77] The Court of Chancery has broad discretion in deciding whether to grant relief under the unclean hands doctrine.[78] "Defendants bear the burden of pleading and proving 'unclean hands' as an affirmative defense."[79] Laches is an affirmative defense barring an action if the plaintiff unreasonably delayed in bringing a claim that he had knowledge of, which resulted in prejudice to the defendant.[80]

---

[76] *NHB Advisors, Inc. v. Monroe Capital LLC*, 2013 WL 6906234, at *2 (Del. Ch. Dec. 27, 2013); *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522-23 (Del. Ch. 1998).

[77] *Nakahara*, 718 A.2d at 522.

[78] *Cf. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015); *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 448-49 (Del. 2000).

[79] *Niehenke v. Right O Way Transp., Inc.*, 1996 WL 74724, at *2 (Del. Ch. Feb. 13, 1996).

[80] *Cf. Whittington v. Dragon Grp., LLC,* 991 A.2d 1, 8 (Del. 2009); *Hudak v. Procek*, 806 A.2d 140, 158 (Del. 2002); *Kraft v. WisdomTree Investments, Inc.,* 145 A.3d 969, 974 (Del. Ch. 2016).

Heckscher argues the duPonts failed to assert the defenses of unclean hands or laches in their responsive pleadings and those defenses are waived.[81] Generally, affirmative defenses that are not plead are waived.[82] However, there is a recognized exception to the general rule when "evidence of an unpled affirmative defense is admitted without objection."[83] Here, the duPonts did not assert the defenses of unclean hands or laches in their responsive pleadings and brought those defenses up for the first time in the opening brief for their motion for summary judgment, as justification to bar Heckscher from collaterally attacking the divorce decree. The duPonts have not sought to amend their pleadings to include those defenses, nor were those issues admitted without objection. Therefore, I conclude that these defenses are waived. Assuming *arguendo* that they are not waived, the doctrines of unclean hands and laches would not prevent the Trust and Heckscher from pursuing this action since there is no evidence that Heckscher, as trustee, unreasonably delayed in bringing a claim that he had knowledge of, to the prejudice of the duPonts. The petition seeks

---

[81] In addition, Heckscher argues that the duPonts' claims are barred by laches and claim preclusion because the duPonts knew that Sam "might not abide by the Separation Agreement as early as 2013," and they had the opportunity to litigate their claim previously during the administration of Sam's estate and, in both instances, failed to do anything. D.I. 71, at 45-47. I do not need to address these issues since I find that the duPonts' claims fail on other grounds.

[82] Ct. Ch. R. 12(b). *Cf. Abdi v. NVR, Inc.*, 945 A.2d 1167 (Del. 2008) (holding that the failure to plead an affirmative defense in the answer to a complaint constitutes a waiver of the right to assert that defense); *Kaplan v. Jackson,* 1994 WL 45429, at *2 (Del. Super. Jan. 20, 1994) (citing *Tydings v. Loewenstein,* 505 A.2d 443, 446 (Del.1986)).

27

clarification concerning whether the LPOA exercise through Sam's Last Will or through the Settlement Agreement controls. It would have been premature for Heckscher to file this petition prior to Sam's death since the testamentary LPOA did not take effect until that time. And, it is not clear how Heckscher's actions – or inaction – as trustee specifically prejudiced the duPonts' claim regarding Sam's agreement to exercise the LPOA in their favor in the Settlement Agreement.

### D. The Settlement Agreement did not release Sam's power to appoint

The duPonts assert that the Settlement Agreement acted as a partial release of Sam's LPOA. Beck responds that the Settlement Agreement was not a partial release, but rather, was a contract to affirmatively exercise Sam's LPOA. Heckscher contends that the Settlement Agreement was not, and was not intended to be, a release or partial release.

Under Delaware law, a power of appointment is usually releasable, with or without consideration, if the release is made in a signed writing and delivered as provided by law.[84] A release of a power of appointment "limits or eliminates the donee's power to appoint."[85] The *Tigani* opinion explains the distinction between a release and a contract to exercise a power of appointment: "A release operates

---

[83] *James v. Glazer*, 570 A.2d 1150, 1154 (Del. 1990); *Knutkowski v. Cross*, 2011 WL 6820335, at *2 (Del. Ch. Dec. 22, 2011) (citations omitted).

[84] 25 *Del. C.* § 502.

[85] *Tigani*, 2016 WL 593169, at *16.

28

negatively, by limiting or altogether eliminating a donee's power of appointment. A contract to appoint, on the other hand, operates affirmatively as a purported exercise of the power."[86]

The Settlement Agreement, in paragraph five entitled "EXERCISE OF POWER OF APPOINTMENT IN FAVOR OF ISSUE OF THIS MARRIAGE," clearly shows that Sam and Helen intended that Sam "exercise the power of appointment" and "make an appropriate testamentary instrument implementing this Agreement, appointing [the duPonts] as the persons to whom Trustee shall pay over and deliver absolutely upon [Sam's] death the entire trust fund."[87]

The duPonts argue that the Trust explicitly permits Sam to release the LPOA and a court "should be liberal as to the form of the release."[88] Flexibility aside, the plain meaning of the language in paragraph five of the Settlement Agreement makes it impossible to view that language as a release. Further, Sam's actions showed what paragraph five intended – he exercised the power of appointment in a will that was included as an attachment to the Settlement Agreement.

---

[86] *Id.* at *17.

[87] D.I. 1, Ex. G ¶ 5.

[88] D.I. 67, at 51 (*citing Wood v. Am. Sec. & Tr. Co.*, 253 F. Supp. 592, 594 (D.D.C. 1966)). The *Wood* Court held that a power to appoint in a will can be released by a contract between the donee and a taker in default. In that case, the Court found that the "form of the release was, although unartful, proper." *Wood*, 253 F. Supp. at 594.

The duPonts cited the statement in *Tigani* that the donee's exercise of her power of appointment in a codicil to her will could, "[a]rguably . . . be read as a partial release or as a contract to release."[89] In *Tigani*, the donee's codicil provided that no property subject to the LPOA that she was exercising "shall be distributed to [her] son [or his issue]." [90] Then Master LeGrow indicated that language might be read as a release, because it acted negatively to limit the donee's power of appointment by reducing the class of permissible appointees of the power.[91] In contrast, the Settlement Agreement, and the 1962 will, represented an affirmative exercise of the LPOA in favor of certain appointees.

The duPonts also assert that the Settlement Agreement, operating as a partial release, is consistent with Ernest's intent since, if the LPOA was not exercised, the Trust property was to be distributed to Sam's lawful issue and the duPonts were the only takers in default at that time. I do not find that argument persuasive. The Trust Agreement indicates that Ernest intended Sam to exercise the LPOA in his last will and testament and, if he failed to do so, his lawful issue *per stirpes* would be the beneficiaries. "Issue" means "*all* of the person's lineal descendants of all generations," and *per stirpes* provides that property is divided proportionately by

---

[89] *Tigani*, 2016 WL 593169, at *16.

[90] *Id.* at *9.

[91] *Id.* at *16.

share.[92]  Contrary to the duPonts' interpretation, the Trust language indicates that, if Sam did not exercise the LPOA, then Ernest intended for all of Sam's issue at the time of his death – not just those from his first marriage – to share in the Trust distribution.  I conclude that paragraph five in the Settlement Agreement, in which Sam agreed to exercise the LPOA in favor of the duPonts, does not constitute a partial release of the LPOA.

### E. Sam's and Heckscher's conduct does not warrant imposition of a constructive trust on trust property

The duPonts claim that Sam's and Heckscher's inequitable conduct warrants the imposition of a constructive trust over the Trust assets, relying on their failure to advise the duPonts for at least 20 years concerning the Herndon Opinion's legal view that the Settlement Agreement did not bind Sam.  And, they allege Heckscher, as trustee, breached his fiduciary duties of impartiality and disclosure by acting as Sam's estate attorney, advising him concerning estate plans, and by preferentially providing information about Sam's estate plans to Beck but not to other beneficiaries.[93]

Beck responds that a constructive trust claim fails, because there is no authority imposing a constructive trust over trust assets based upon misconduct of a beneficiary

---

[92] *See* 12 *Del. C.* § 101 (emphasis added); *Merriam-Webster.com* (Sept. 5, 2018).

[93] D.I. 67, at 55-58.

or trustee, and the duPonts had an adequate remedy at law.[94] Heckscher argues that the duPonts are not entitled to a constructive trust, because neither he nor Sam acted improperly; he breached no duty of disclosure to the duPonts and provided no information about Sam's intentions to any beneficiary;[95] and he had no duty to disclose knowledge gained from his responsibilities as Sam's estate counsel, which were unrelated to his duties as trustee.[96] He further claims the duPonts had an adequate remedy at law through their claim against Sam's estate for contractual damages, and that neither he nor Sam were enriched, nor has a nexus been proven between the alleged misconduct and the alleged enrichment, as is required to impose a constructive trust.

A constructive trust is an implied trust, not based upon a valid written trust agreement, that is imposed when a court finds the fraudulent, unfair or unconscionable conduct of one of the parties caused him to be unjustly enriched at the expense of another to whom he owes some duty.[97] Delaware courts have

---

[94] D.I. 72, at 46-48. Beck argues the duPonts could have filed a claim against Sam's estate in Maryland, chose not to do so, and are time-barred.

[95] D.I. 71, at 42 (citation omitted). Heckscher stated that any information given to Beck came at Sam's direction in his capacity as Sam's estate attorney. *Id.* at 40.

[96] D.I. 71, at 39-40. Heckscher claims his duty as trustee with regard to the power of appointment was limited to inquiring "whether or not it comports with the dictates of the [donor]."

[97] *Cf. Adams v. Jankouskas*, 452 A.2d 148, 151-52 (Del. 1982); *Hogg v. Walker*, 1989 WL 128572, at *1 (Del. Ch. Oct. 27, 1989). Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Kuroda v. SPJS Holdings,*

recognized that, where there is such trust between family members that a confidential relationship is created, the court can grant equitable relief to remedy inequitable conduct of a family member who was unjustly enriched by their actions.[98]

Here, the duPonts seek to impose a constructive trust over Trust property because of Sam's and Heckscher's actions. I will address the argument as it pertains to Sam's and Heckscher's actions separately.

First, it is undisputed that Sam acted contrary to his agreement in the divorce action when he exercised the LPOA differently in his Last Will. He breached that agreement and the duPonts could have sought remedial claims against Sam's estate for that breach. That breach of contract claim, however, is not against the Trust, since the Trust was not a party to that agreement. The key consideration against the duPonts' argument that Sam's actions warrant a constructive trust is that they wish to

---

*LLC*, 971 A.2d 872, 891 (Del. Ch. 2009) (citation omitted). A claim for unjust enrichment is not available if there is an "express, enforceable contract that controls the parties' relationship." *Id.* However, if there is doubt concerning the enforceability of the contract, courts have permitted an alternative unjust enrichment claim. *Kushaim v. Tullow Inc.*, 2016 WL 3594752, at *8 (Del. Super. June 27, 2016) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005)). In response to Heckscher's argument that the duPonts' constructive trust claim, which incorporates unjust enrichment, is precluded because of their contract claim, I find that it is not precluded in this instance because there was doubt concerning the enforceability of the contract – the Settlement Agreement – as to the LPOA exercise, which has borne out based upon my findings in this report.

[98] *See In re Wilbert L.*, 2010 WL 3565489, at *6 (Del. Ch. Sept. 1, 2010); *Wagner v. Hendry,* 2000 WL 238009, at *8-*9 (Del Ch. Feb. 23, 2000).

impose that trust on Trust property – not on Sam's property.[99]   Sam, a donee and

beneficiary of the Trust, has no rights in Trust property such that Trust property could

be obligated because of his actions.[100]

Next, I consider whether Heckscher's actions warrant the imposition of a

constructive trust on Trust property.  I find that his actions do not.  The duPonts argue

that Heckscher, as trustee, breached his duties of disclosure and of impartiality, which

Heckscher denies.

Generally, a trustee must "act as a reasonable and prudent person in managing

the trust."[101]  A trustee has a duty to act impartially in administering the trust and in

communicating with beneficiaries, including acting with "due regard for the diverse

---

[99] With regard to the other considerations for imposing a constructive trust - arguably, Sam could have been considered as in a confidential relationship with the duPonts, although the evidence of a relatively distant relationship between Sam and the duPonts over the years does not support such a relationship.  And, the tangible evidence of Sam's enrichment, or benefit, from his action is attenuated, since he did not receive additional economic benefits due to his alteration of the LPOA. I do not need to make findings on either of these issues, however.

[100] This case is distinguishable from *In re Wilbert L.*, 2010 WL 3565489, at \*6.  In *In re Wilbert L.*, the person violating the trust had been adopted by his ex-spouse based upon his promise that he would direct all funds he received as a trust beneficiary to their children. He, ultimately, sought to retain the trust benefits for himself. *Id.*  Due to his actions and the confidential relationship, the Court barred the ex-spouse from claiming economic benefit for himself. The remedy imposed was to bar the ex-spouse from claiming personal economic benefit from the trust – he was precluded from receiving property to which he had direct rights as a beneficiary and through which he was unjustly enriched personally.  Here, the persons who allegedly committed the bad conduct do not have any direct rights in the Trust property over which the constructive trust is sought.

[101] *McNeil v. McNeil*, 798 A.2d 503, 509 (Del. 2002).

beneficial interests created by the terms of the trust."[102] A trustee has the duty to furnish information to beneficiaries "upon reasonable request."[103] And, even in the absence of a request for information, "a trustee must communicate essential facts, such as the existence of the basic terms of the trust."[104] The trustee's duty to communicate has focused on keeping beneficiaries reasonably informed of significant developments concerning the trust, which have typically included circumstances affecting the beneficiary's entitlement to distributions under the trust.[105]

It is undisputed that Heckscher did not provide information about Sam's intentions regarding his estate plans to the duPonts during Sam's lifetime. But, Heckscher did not violate his fiduciary duty of disclosure to the duPonts by not sharing that information about Sam's estate plans with them. Heckscher's knowledge about Sam's estate plans arose from his work as Sam's estate attorney and not as

---

[102] *Merrill Lynch Tr. Co., FSB v. Campbell*, 2009 WL 2913893, at \*7 (Del. Ch. Sept. 2, 2009) (holding that "in investing, protecting, and distributing the trust estate, and in other administrative functions, the trustee must act impartially and with due regard for the diverse beneficial interests created by the terms of the trust," and "in consulting and otherwise communicating with beneficiaries, the trustee must proceed in a manner that fairly reflects the diversity of their concerns and beneficial interests").

[103] *McNeil*, 798 A.2d at 510.

[104] *Id.* (holding that the fact a person is a current beneficiary is an essential fact).

[105] *NHB Advisors, Inc. v. Monroe Capital LLC*, 2013 WL 6906234, at \*4 (Del. Ch. Dec. 27, 2013) (quoting the Restatement (Third) of Trusts, which provides that a trustee has a duty to keep beneficiaries "reasonably informed of changes involving the trusteeship and about other significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests," and that "'[s]ignificant developments' typically include circumstances where a beneficiary has become entitled or ceases to be entitled to distributions or to request distributions").

trustee.[106]   The only effective exercise of Sam's power of appointment was the exercise in Sam's Last Will.   The evidence shows that Sam modified his will many times over the years – and, up until he executed his Last Will, could have changed his mind and exercised the power of appointment to benefit the duPonts.  Even assuming Heckscher was able to share information about Sam's estate planning as trustee, it would not be reasonable to expect him to notify all beneficiaries each time that he was aware that Sam changed the LPOA in his will, because it was possible Sam would change it again, and the power was not actually exercised until Sam died.  This is not a situation where the trustee failed to tell a beneficiary that he was a current beneficiary.[107]   The duPonts did not have greater rights because of the Settlement Agreement, but had the same rights as any potential beneficiaries, whose rights, ultimately, were dependent upon Sam's exercise of the LPOA in his Last Will.      In addition, Heckscher did not violate his fiduciary duty of impartiality by providing information to some beneficiaries and not others.  He was involved in meetings with Beck and Sam in which Sam's estate plans were discussed, but any information he

---

[106] Heckscher's dual role as trustee of the Trust and as estate attorney to Sam complicated the situation.  However, his knowledge about Sam's estate plans, and his interactions with other contingent beneficiaries on Sam's behalf related to estate planning, came from his work as Sam's estate attorney.  And as Sam's attorney, Heckscher would not have been able to divulge information regarding Sam's estate plans unless Sam permitted him to do so.

[107] This situation is different than the factual situation in *McNeil*.  In *McNeil*, the trustees failed to let one of the current beneficiaries know that he was a beneficiary under the trust, despite his repeated attempts to get information from them and, through that failure, the

provided to Beck was given at Sam's direction and in his capacity as Sam's estate attorney, and not as trustee.[108] Considering the evidence as a whole, I do not find that Heckscher's actions represent a breach of his fiduciary duties.[109]

## F. Attorneys' fees and costs

Heckscher, Beck and the duPonts all seek their attorneys' fees and costs to be paid from Trust funds. In trust litigation, the Court has the discretion, "as justice and equity may require," to award reasonable attorneys' fees to any party, to be paid by another party or from the trust at issue.[110] The general rule is that a trustee is entitled to reasonable attorneys' fees when defending a trust and his own actions as a trustee.[111] Exceptions to that rule focus on whether the trustee acted in bad faith or fraudulently, and depend upon the extent of the trustee's wrongful conduct, and whether his actions benefitted the trust.[112] Although the Trust does not specifically

---

trustees managed trust operations in a way that showed partiality to other beneficiaries. *McNeil*, 798 A.2d at 507, 510.

[108] D.I. 71, at 40-41.

[109] And, there was no showing that his actions affected, or could have affected, Sam's decision concerning the LPOA exercise in his Last Will, which is determinative concerning the interests of contingent beneficiaries.

[110] 12 *Del. C.* § 3584.

[111] *E.g., In re Unfunded Ins. Tr. Agreement of Capaldi*, 870 A.2d 493, 496 (Del. 2005); *McNeil*, 798 A.2d at 515. *In re Estate of Valan*, 2000 WL 567859, at *4 (Del. Ch. Mar. 30, 2000).

[112] *McNeil*, 798 A.2d at 514-15. *Lockwood v. OFB Corp.*, 1975 WL 1262, at *1 (Del. Ch. Dec. 1, 1975) (holding that, where a surcharged trustee seeks reimbursement for attorneys' fees and expenses, the Court considers the nature of the breach in deciding whether to deny such reimbursement).

37

address the employment of attorneys related to trust administration, it grants the trustees the general power to "do and perform any and all acts and things in relation to the trust fund in the same manner and to the same extent as an individual might or could do with respect to his own property," which would reasonably cover the payment of attorneys' fees related to legal action to determine the appropriate distribution of the Trust.[113]   I conclude that Heckscher has not breached his fiduciary duties – or acted in bad faith, fraudulently, or wrongfully.  I recommend the Court conclude that the attorneys' fees and costs incurred by Heckscher related to this litigation are entitled to be paid from the Trust.

With regard to Beck's and the duPonts' claims for attorneys' fees, courts have the discretion to award attorneys' fees in trust litigation where the attorney's services "are necessary for the proper administration of the trust" or benefited the trust.[114] With regard to reimbursement for attorneys' fees for beneficiaries involved in a trust dispute, the analysis focuses on whether the benefits to the trust through the beneficiaries' role in the litigation outweigh their personal motives, even though they may have been motivated by self-interest.[115]  I find that Beck's involvement in this litigation, although it may have been motivated by her personal interests, also benefitted the Trust by ensuring that the Trust was properly administered and the

---

[113] D.I. 67, Ex. 1, Art. III § 5.

[114] *Capaldi,* 870 A.2d at 496; *McNeil,* 798 A.2d at 514-15.

[115] *Capaldi,* 870 A.2d at 498.

LPOA was exercised consistent with the donor's intent. And, although the duPonts may have been motivated by personal interest and their positions were ultimately unsuccessful, their positions were not unreasonable and they, too, intended to further the proper administration of the Trust. Accordingly, I recommend that the Court find that the payment of Beck's and the duPonts' attorneys' fees and costs related to this litigation are entitled to be paid from the Trust.

The amount and reasonableness of all of the awards of attorneys' fees and costs related to this litigation remain to be addressed in affidavits of fees to be submitted by the parties.

## V. Conclusion

For the foregoing reasons, I find that the Settlement Agreement incorporated in the Nevada divorce decree does not bind the Trust, nor does it represent a partial release of Sam's limited power of appointment. I also conclude that imposing a constructive trust over Trust property is not appropriate in these circumstances. Accordingly, I recommend that the Court find there are no material issues of fact in dispute in this case, grant Beck's motion for summary judgment as she is entitled to judgment as a matter of law, and deny the duPonts' cross-motion for summary judgment. In furtherance of these conclusions, I recommend the Court order the co-trustees to distribute the Trust principal and income consistent with the exercise of

Sam's power of appointment in his Last Will.  This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.[116]

---

[116] The parties asked that I waive the issuance of a draft report, to the extent I consider such a waiver appropriate, and I have complied with their request. *See* D.I. 45.